## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-KA-00600-SCT

*IKE FARRIS a/k/a ISAAC NASER FARRIS*

*a/k/a 'IKE'*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/20/1998 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | HERBERT H. KLEIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | E. LINDSAY CARTER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/08/2000 |
| MOTION FOR REHEARING FILED: | 7/6/2000; denied 8/31/2000 |
| MANDATE ISSUED: | 9/7/2000 |

## BEFORE PRATHER, C.J., BANKS, P.J., AND MILLS, J.

## MILLS, JUSTICE, FOR THE COURT:

## STATEMENT OF THE CASE

¶1. Appellant Ike Farris, a Hattiesburg attorney, was charged with conspiring to defraud the conservatorship of Jack Diamond, a Picayune businessman who was physically incapacitated after suffering several strokes. Charged with Farris were Scott Morgan, a Hattiesburg policeman, and Gregory Alston, another lawyer in Hattiesburg. The indictment further named Charles Morgan (Scott's father), and former Chancellor William Robert Taylor, both deceased, as unindicted co-conspirators.

¶2. Severed indictments mandated separate jury trials for each defendant. A Harrison County jury granted Gregory Alston a complete acquittal. Scott Morgan was convicted of conspiracy, but on appeal this Court reversed and remanded his case for a new trial based on the admission of prejudicial hearsay testimony and evidence of Chancellor Taylor's suicide. *__Morgan v. State__*, 741 So.2d 246 (Miss. 1999).

¶3. Ike Farris was tried before a Forrest County jury, convicted of conspiracy and sentenced to five years in the custody of the Mississippi Department of Corrections with two years suspended on two years unsupervised probation and three years to serve, payment of a $5,000 fine and all court costs, and disbarment from the further practice of law in the State of Mississippi as provided by Miss. Code Ann. §

73-3-41(1995). On appeal, he raises eleven issues.

## ISSUES

**I. WHETHER THE INDICTMENT SUFFICIENTLY INFORMED IKE FARRIS OF THE CONSPIRACY CHARGE AGAINST HIM.**

**II. WHETHER THE TRIAL COURT ERRED IN OVERRULING THE FARRIS MOTION TO DISMISS BASED UPON COLLATERAL ESTOPPEL AND LACK OF JURISDICTION.**

**III. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT A CONTINUANCE UNTIL THE CHANCERY COURT RULED ON THE FINAL ACCOUNTING BY FARRIS.**

**IV. WHETHER THE TRIAL COURT ERRED IN OVERRULING THE FARRIS MOTION TO DISMISS BASED UPON IMMUNITY.**

**V. WHETHER THE TRIAL COURT ERRED IN RULING THAT THE CONSPIRACY AS CHARGED IN THE INDICTMENT WAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE, THEREBY RESULTING IN THE ADMISSION OF EVIDENCE FROM CO-CONSPIRATORS.**

**VI. WHETHER THE TRIAL COURT ERRED IN ADMITTING HEARSAY TESTIMONY.**

**VII. WHETHER THE TRIAL COURT ERRED IN ADMITTING SUMMARY EVIDENCE PRESENTED BY THE STATE.**

**VIII. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF PAYMENTS MADE PRIOR TO THE ISSUANCE OF THE CHANCERY COURT ORDER.**

**IX. WHETHER THE TRIAL COURT ERRED BY DENYING THE FARRIS MOTION TO RECUSE THE DISTRICT ATTORNEY.**

**X. WHETHER THE TRIAL COURT ERRED IN RULING THAT THERE WAS NO EVIDENCE OF SELECTIVE PROSECUTION.**

**XI. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING THE FARRIS MOTION FOR A DIRECTED VERDICT, A JNOV OR A NEW TRIAL.**

## FACTS

¶4. Jack Diamond owned Allied Heirlooms, a specialty dry cleaning business located in Picayune, Mississippi. After Diamond was incapacitated by a series of strokes, Chancellor William Robert Taylor appointed Susan Smith Williams, Diamond's daughter and sole heir at law, as conservator of his personal and business interests. In March of 1994, Jack Parsons, an attorney who had represented Diamond prior to his strokes, filed a motion seeking the appointment of a guardian ad litem, alleging that various people,

including Susan Smith Williams, were stealing from her father and his business. Chancellor Taylor subsequently appointed Robert Jackson, Jr. as guardian ad litem. Jackson determined that the Diamond estate had been mismanaged, and upon his motion, Carley Cooper, a Picayune businessman, was appointed by Chancellor Taylor as the new conservator for the Diamond estate, replacing Diamond's daughter.

¶5. In April of 1994, an entity known as Manhattan Square Limited entered the fray. Sam Farris, a Hattiesburg attorney and brother of the appellant, Ike Farris, sought to purchase Allied Heirlooms on behalf of Manhattan. Manhattan was comprised of two individuals, a Picayune businessman named Gene Combs, and a New Orleans lawyer named Don Theriot. In August of 1994 Sam Farris, on behalf of Manhattan, filed a petition before Chancellor Taylor to purchase Allied Heirlooms for $700,000. No action was taken on this petition. In the late summer or early fall of 1995, Sam Farris, informed Brian O'Rourke, Manhattan's financial consultant, that O'Rourke could be appointed chief financial officer for Allied Heirlooms by simply sending Chancellor Taylor a resume and attending a hearing.

¶6. On December 8, 1994, attorney Jay Jernigan was appointed by Chancellor Taylor to replace Robert Jackson as guardian ad litem. Jernigan was instructed by the Chancellor to determine whether Diamond would recover from the stroke. Chancellor Taylor also ordered Jernigan to hire Greg Anderson of Horne CPA Group in Hattiesburg to appraise Allied Heirlooms. Jernigan also filed suit against Diamond's relatives, alleging mismanagement of his assets, and against certain banks for allowing Diamond's money to be spent without a court order. Jernigan was serving as guardian ad litem in June of 1995, when Chancellor Taylor, in the Pearl River County Courthouse, first asked Jernigan to give him a kickback by padding his bills to the Diamond estate for his services as guardian ad litem. Jernigan testified that the Chancellor approached him several more times with further requests that he pad his bills and retain some of the excess funds for the Chancellor.

¶7. Having accumulated nearly $700,000 in cash by the fall of 1995, Allied Heirlooms was temporarily restored to financial security under conservator Carley Cooper's direction. Greg Anderson's valuation of Allied Heirlooms, dated in September of 1995, showed that the business was worth almost $3,000,000. Jernigan, as guardian ad litem, then learned that Cooper had entered into a contract to buy Allied Heirlooms from Susan Smith Williams, Diamond's daughter and sole heir. Recognizing an apparent conflict of interest, Jernigan filed a petition to have Cooper removed as conservator.

¶8. On October 9, 1995, a hearing was held on the petition to remove Cooper as conservator. Following the hearing, Chancellor Taylor made new appointments: Jay Jernigan was named as the new conservator of the Diamond estate; Bryan O'Rourke, the Manhattan financial consultant working with Sam Farris, was appointed chief financial officer of Allied Heirlooms; and Todd Bradley, a Hattiesburg businessman, was named plant manager for the business. Pursuant to a motion filed by Sam Farris on behalf of Manhattan, the chancellor ordered O'Rourke to assist Jernigan in auditing Allied Heirlooms and maintaining monthly financial records. Chancellor Taylor, at the same hearing, and acting on the motion of Jernigan, entered an order requiring the signatures of both Jernigan and O'Rourke for any withdrawals from Allied Heirlooms. A few days later, on October 12, 1995, Chancellor Taylor appointed Ike Farris to replace Jernigan as guardian ad litem.

¶9. In late November of 1995, Chancellor Taylor solicited another kickback from Jernigan in the Forrest County Chancery Court Building. This entreaty troubled Jernigan and he was also concerned about

O'Rourke's appointment as chief financial officer of Allied Heirlooms and his dual representation of Manhattan Limited as a potential business purchaser. Jernigan approached Chancellor Taylor regarding these matters and was told by the Chancellor "to deal with it." Unable to approve the apparent developing pattern of illegality, Jernigan resigned as conservator on December 15, 1995.

¶10. Following Jernigan's resignation, Chancellor Taylor tapped Charlie Morgan, who suffered from severe emphysema and was wheel-chair bound, as the new conservator for both the Diamond estate and Allied Heirlooms. Greg Alston, Chancellor Taylor's neighbor, was appointed attorney for the conservatorship. Although Brian O'Rourke continued in his court-appointed capacity as chief financial officer of Allied Heirlooms, Chancellor Taylor terminated O'Rourke's authority to write checks for the business in December of 1995 --- only two months after O'Rourke's initial appointment.

¶11. On January 16, 1996, Chancellor Taylor ordered and conducted an in camera hearing involving Allied Heirlooms and the Diamond conservatorship. Present were Greg Anderson, C.P.A.; Ike Farris, Diamond's guardian ad litem; Charlie Morgan, Diamond's conservator; Greg Alston, attorney for the conservatorship; Bryan O'Rourke, the financial analyst for Manhattan Limited and court-appointed chief financial officer of Allied; and Todd Bradley, the interim general manager for Allied. Ike Farris issued a subpoena duces tecum commanding Anderson to produce the business valuation records and his financial report. On direct examination he repeatedly asked specific questions about the financial position of Allied and whether anyone else had seen Anderson's report. Anderson continually answered in the negative and then gave the materials to Chancellor Taylor. The packet containing the records and report was never opened or reviewed by Ike Farris or any other participant at the hearing. No one at the hearing asked the actual value of the business, but Ike Farris asked numerous questions as to what financial information the report contained. Ike Farris attempted to ask about the health of Jack Diamond, but he was interrupted by Chancellor Taylor and Diamond's health status was never subsequently discussed on the record.

¶12. Evidence in the criminal trial adduced that during the January 16, 1996, in camera hearing, Todd Bradley, the court-appointed general manager of Allied, informed Chancellor Taylor of his concerns regarding the business's lack of direction and the high attorney fees. In the hearing Bradley stated his concern that people might question his motives in wanting to bid on the business if Allied Heirlooms went bankrupt while he was at the helm. The chancellor, in the presence of Ike Farris and others, simply stated that maintaining the conservatorship was going to be very expensive.

¶13. Counsel for Ike Farris argued in the criminal trial below that the purpose of this in camera hearing was to determine whether Jack Diamond would eventually recover his health and whether it would be in Diamond's best interest for Allied to be sold. From Farris's standpoint, Chancellor Taylor was exclusively in control of the meeting and the agenda. The business records were not opened, according to Farris, because such information would give a potential purchaser a tremendous bargaining advantage in bidding on the business.

¶14. The prosecution termed this hearing a "cover your butt" meeting and alleged that the co-conspirators used the color of the Chancery Court's authority to shield or insulate them from the appearance of impropriety. The prosecution's theory of the case was that the co-conspirators, including Ike Farris, were scheming to milk the profits from Allied Heirlooms through unnecessary expenses, thereby deflating the value of the business. The State implied that the ultimate goal of the co-conspirators was to sell the business at an artificial discount, thereby pocketing the margin between the deflated business valuation and the real

value in the form of a kickback.

¶15. The artificial discount, in the State's view, was made possible through over-billing and needless expenses. These goals were consistent with later testimony from Gene Combs, a one-time partner in Manhattan Limited, who approached Chancellor Taylor about purchasing Allied Heirlooms late in the year of 1995 -- after he left the Manhattan partnership with Don Theriot. Combs testified that when he offered to independently purchase Allied, Chancellor Taylor told him that one-third of the business would have to be set aside for Chancellor Taylor's personal benefit. Combs testified that shortly after Chancellor Taylor's solicitation, Greg Alston also told him that one-third of the sale price of the business would have to be retained for the Chancellor.

¶16. In addition to being a financial analyst for Manhattan, Brian O'Rourke was the court-appointed chief financial officer of Allied Heirlooms. He testified in the criminal trial that after the January 16 hearing, several people, including himself, remained to talk off the record about the Diamond conservatorship. Those present included Charlie Morgan, Greg Alston, Ike Farris and Chancellor Taylor. Morgan stated that he wanted the bank accounts moved from Picayune to Hattiesburg and set up so that Bradley and other Allied personnel would not know about certain business expenses which were related to "confidential business matters." For no apparent reason, Charlie Morgan also expressed concern for Jack Diamond's safety and the feigned need for private security. O'Rourke suggested that the Picayune Police Department be contacted for any security needs, but his recommendation fell on deaf ears. Immediately after the closed-door meeting, Ike Farris told O'Rourke that he was making Farris look bad because O'Rourke was not billing the conservatorship for enough money.

¶17. On January 30, 1996, Morgan and Alston petitioned Chancellor Taylor to transfer Jack Diamond's personal bank account in Picayune to a Hattiesburg Bank. That same day Chancellor Taylor approved the corresponding order. O'Rourke testified that in February of 1996, he met with Charlie Morgan and Alston to discuss financial accounting for Allied and the transfer of Jack Diamond's personal bank account from Picayune to Hattiesburg. Although Charlie Morgan was wheel-chair bound and feebly using an oxygen apparatus for his labored breathing, he had the presence of mind to tell O'Rourke that he wanted several separate accounts in Hattiesburg: one for Jack Diamond personally; one for Allied Heirlooms; and another for "special expenses" that Morgan had pertaining to Allied or Diamond's personal welfare.

¶18. O'Rourke testified that during this meeting, Alston and Charlie Morgan told him that he would not be involved with the daily accounting of Allied Heirlooms even though he was the chief financial officer of the business. Alston and Charlie Morgan limited O'Rourke's responsibility to compiling bank statements and financial statements for Allied at the end of 1996. This limitation prevented O'Rourke from continuously monitoring the financial records of the business or questioning the accelerating conservatorship fees.

¶19. O'Rourke testified that after Charlie Morgan died of emphysema in August of 1996, he met with Greg Alston and Scott Morgan, the son of the late conservator, at Allied Heirlooms to discuss the financial condition of the business. Alston informed O'Rourke that they were spending $35,000 to $40,000 a month on attorney's fees for Allied and the conservatorship. Prior to that time, O'Rourke had no way of knowing or questioning any monthly business expenses. O'Rourke was shocked at the expenses and expressed his concern that Allied Heirlooms could not support such a large and continuous outflow of cash. Alston stated in response "that's just what it costs." O'Rourke subsequently wrote a letter to Greg Alston, which was entered into evidence by the prosecution, documenting the discussion of excessive expenses and the danger

it posed to Allied's survival.

¶20. Ike Farris received approximately $50,000 as payment for his services as guardian ad litem during 1996. He filed only one separate petition for payment for conservatorship work. However, he testified that he would regularly submit bills for his work as guardian ad litem to Greg Alston, who would in turn submit the Farris bills to conservator Charlie Morgan, who then presented all of them to Chancellor Taylor for payment. Farris would then return to Alston's office and pick up his payment.

¶21. Jernigan testified at trial that he notified a criminal investigator for the Internal Revenue Service and Rex Jones, an assistant district attorney in Hattiesburg, of the apparent fraudulent proceedings and the continued kickback solicitations from Chancellor Taylor. Jernigan testified that he decided to resign after disclosing this information to the authorities. Before he could deliver a formal resignation letter to Chancellor Taylor, he was visited by Greg Alston, attorney for the conservatorship and neighbor of Chancellor Taylor, who delivered a letter of resignation, prepared by the chancellor, for Jernigan's signature. The letter based his resignation on supposed personal reasons. Jernigan refused to sign this letter and instead prepared his own resignation, citing O'Rourke's position as an officer of Allied and his dual role in representing Manhattan as an unacceptable conflict of interest. Jernigan also testified at trial that Chancellor Taylor's continued solicitations for kickbacks contributed to his resignation, though this fact was not mentioned in his final letter of resignation.

¶22. In response to a request for assistance from local authorities, the Public Integrity Division of the Mississippi Attorney General's Office aided the investigation and subsequent prosecution. On November 15, 1996, after the investigation began, Jernigan informed Assistant District Attorney Rex Jones that Chancellor Taylor had solicited kickbacks from him. Jernigan then informed Chancellor Taylor of what he had disclosed to the district attorney's office. Shortly thereafter, Chancellor Robert Taylor committed suicide.

¶23. Farris testified in the criminal trial that he understood the duties of a conservator and a guardian ad litem because he was a lawyer. He testified, however, that Jernigan instructed him on the proper procedure for submitting bills to the conservatorship, and he admitted that there were several checks which had been issued to him without a corresponding court order. Farris attempted to explain the improper disbursements by claiming that Greg Alston and Charlie Morgan were the ones who filed most of the petitions resulting in his fees.

¶24. Farris testified that he believed someone was trying to kill Jack Diamond and that he knew of expensive private guards being paid from conservatorship funds, though he never informed the local chief of police of his concern or questioned the propriety of security fees. Farris described his primary duty as being a protector of Jack Diamond's personal interests, but admitted that he did not even look at the Diamond conservatorship court file during the year of 1996, when he, along with Alston, Charlie Morgan and Scott Morgan, jointly billed the conservatorship for over $218,000 in fees.

¶25. In closing arguments and throughout the trial, the prosecution argued that Ike Farris was clearly part of a conspiracy to defraud Jack Diamond and Allied Heirlooms, alleging that he overcharged for unnecessary or fictitious work. While much of the prosecution's evidence admitted at trial went to the actions of the other alleged co-conspirators, Ike Farris continually appeared at hearings and other activities as a supposed protector and guardian ad litem for Jack Diamond. Counsel for Farris admitted that there was a conspiracy among other people named in the indictment but argued that Farris was innocent because he lacked any

direct knowledge of criminal activity. The general argument of the defense was that while he may have made a few billing mistakes, there was some work that Farris did as guardian ad litem which was not billed to the conservatorship.

¶26. The jury found Ike Farris guilty of conspiracy, from which verdict he appeals.

## DISCUSSION

### I. WHETHER THE INDICTMENT SUFFICIENTLY INFORMED IKE FARRIS OF THE CONSPIRACY CHARGE AGAINST HIM.

¶27. Farris claims that the indictment against him was fatally flawed for lack of a concise description of the essential facts of each alleged offense. The indictment, in pertinent part, reads as follows:

> Beginning from on or about August 9, 1993, and continuing through November, 1996, in Forrest County, Mississippi, and elsewhere, GREGORY ALSTON, SCOTT MORGAN, AND IKE FARRIS, the Defendants herein, did willfully, knowingly, unlawfully, and feloniously conspire and agree together and with the late Chancery Judge William Robert Taylor, the late Charles Morgan, and with persons known and unknown to the Grand Jury, to cheat and defraud the conservatorship of Jack Diamond out of property and money in excess of $250.00 by means which are in themselves criminal, or which, if executed, would amount to a cheat, or to obtain money or any other property or thing by false pretense, in violations of MCA 97-1-1(d), as amended.

> The conduct described herein also constitutes the crime of Conspiracy to commit acts which are injurious to public morals, or for the perversion or obstruction of justice, or the due administration of the laws in violation of MCA 97-1-1(f).

> The scheme consisted of obtaining payment for fees and services which were not reasonable, necessary, or earned, including, but not limited to, attorneys fees, conservator fees, and fees for the Guardian ad litem. The scheme further included payments to Scott Morgan, his friends, family and relatives for services, including but not limited to security services, which were not reasonable, necessary or earned. The scheme also included demands by Judge Taylor for payment of money to him for which he was not entitled nor authorized by law to receive.

¶28. The polestar consideration to determine the sufficiency of an indictment is Rule 7.06 of the Mississippi Uniform Rules of Circuit and County Court Practice, which provides in pertinent part:

> The indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation. Formal and technical words are not necessary in an indictment, if the offense can be substantially described without them. . . .

*Harrison v. State,* 722 So.2d 681, 686 (Miss.1998). So long as a fair reading of the indictment, taken as a whole, clearly describes the nature and cause of the charge against the accused, the indictment is legally sufficient. *Id.* at 687 (citing *Henderson v. State*, 445 So.2d 1364, 1368 (Miss.1984)).

¶29. The indictment in this case fairly placed Farris on notice that he was charged with conspiring with others to defraud the conservatorship of Jack Diamond. The time period was stated, four of the alleged co-

conspirators were named, and the offense was clearly described. The indictment tracked the language of Miss. Code Ann. § 97-1-1(1994), and sufficiently notified Farris of the charge against him, thus enabling him to prepare a defense. This issue fails.

### II. WHETHER THE TRIAL COURT ERRED IN OVERRULING THE FARRIS MOTION TO DISMISS BASED UPON COLLATERAL ESTOPPEL AND LACK OF JURISDICTION.

¶30. Farris argues that this criminal prosecution based on his chancery court awarded fees as guardian ad litem for Diamond will have a chilling effect on the administration of estates, guardianships, and conservatorships throughout this State. He submits that either the Circuit Court of Forrest County lacked jurisdiction to review official activities surrounding the Diamond conservatorship in Pearl River Chancery Court or, since Chancellor Taylor's orders are final, the Forrest County Circuit Court was collaterally estopped from re-litigating the issue of whether the orders were fraudulent or part of a criminal conspiracy.

¶31. Article 6, § 159 of the Mississippi Constitution places full jurisdiction of matters testamentary, as well as cases of idiocy, lunacy, persons of unsound mind, and minor's business with the chancery court. Conservatorships are controlled by "all laws relative to the guardianship of a minor." Miss. Code Ann. § 93-13-259 (1972). Article 6, Section 157 of the Mississippi Constitution requires that all causes that may be brought in the circuit court where the chancery court has exclusive jurisdiction shall be transferred to the chancery court.

¶32. Farris alleges that since no evidence at trial rendered Chancellor Taylor's orders void, Mississippi Rule of Civil Procedure 60(b) requires the district attorney or present conservator to first file a motion against him in chancery court alleging fraud, misrepresentation or other misconduct. Miss. Code Ann. § 93-13-77 allows for a petition to be filed in the chancery court alleging fraud and payment for services not rendered. The standard of proof in these proceedings would be clear and convincing evidence. *Iuka Guar. Bank v. Beard*, 658 So.2d 1367 (Miss.1995). Pointing to the lower probable cause standard of proof necessary for a proper indictment, Farris argues that the prosecutor usurped the proper jurisdiction of the Pearl River County Chancery Court by obtaining a grand jury indictment on a lesser standard of proof. Therefore, Farris submits that Chancellor Taylor's orders approving his fees can't be challenged in the Forrest County Circuit Court.

¶33. Rule 60(b) does not mandate that a district attorney or a conservator file a chancery court civil motion in lieu of presenting a criminal indictment to a grand jury. The authority for a Rule 60(b) motion in chancery court alleging fraud, misrepresentation or other misconduct does not mean that the higher burden of proving the civil action precludes a district attorney from using the familiar "probable cause" necessary for a conspiracy indictment. It is simply a non-exclusive civil remedy available to private persons in addition to the criminal powers of the State. This rule does not limit the power of the State to prosecute criminal acts which may also be civil wrongs. "It is a fundamental principle of our criminal justice system that a prosecutor is afforded prosecutorial discretion over what charge to bring in any criminal trial." *Watts v. State*, 717 So.2d 314, 320 (Miss.1998)(citing *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)).

¶34. We have repeatedly held that orders of a court having competent jurisdiction are presumed valid. *Roussel v. Hutton*, 638 So.2d 1305, 1319 (Miss.1994)(citing *Kirk v. Koch*, 607 So.2d 1220, 1223 (Miss.1992)); *see also Vinson v. Johnson*, 493 So.2d 947, 949 (Miss.1986); *Jackson v. State*, 199

Miss. 853, 25 So.2d 483 (1946). While there was a presumption that Chancellor Taylor's orders were facially valid, the prosecution introduced evidence at trial which overcame that rebuttable civil presumption by proving beyond a reasonable doubt to the jury's satisfaction that those orders were part of a criminal conspiracy involving Ike Farris. To the extent Chancellor Taylor's orders played a part in the conspiracy trial, the issue of whether those orders were valid was a question of evidence, not jurisdiction.

¶35. Accepting Farris's argument that he was entitled to a higher standard of proof under Rule 60(b) would mandate a holding that chancery courts are the proper forum for all criminal charges related to actions under exclusive chancery jurisdiction. Chancery courts, under Article 6, Section 159, clearly do not have jurisdiction to try criminal matters. This untenable reasoning was not contemplated in Article 6, Section 156, and it is not our duty to implement folly in the law under the guise of strained logic.

¶36. We reject Farris's argument on lack of jurisdiction. While it is true that the Mississippi Constitution vests exclusive jurisdiction of conservatorships in the chancery court, Article 6, § 156 also vests original jurisdiction for criminal matters in the circuit court. The vesting of jurisdiction for conservatorships in chancery court, simply put, does not preclude circuit court jurisdiction for criminal matters that happen to coincide with civil matters in chancery court, regardless of whether those criminal matters happen to involve a conservator, guardian ad litem, or even a chancellor. To hold otherwise would be to allow chancellors and unethical chancery practitioners insulation under Article 6, § 159, safe in the knowledge that their actions, however corrupt or criminal, could not be reviewed under the circuit court's original jurisdiction of criminal matters in Article 6, § 156.

¶37. Farris also argues that his criminal proceedings were barred by the doctrine of collateral estoppel. Collateral estoppel provides that an issue of ultimate fact which was a valid and final judgment may not be re-litigated between the same parties in a subsequent suit. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). This doctrine is a practical civil extension of the Double Jeopardy Clause in the Fifth Amendment to the United States Constitution, which states that "nor shall any person be subject for the same offence to be twice put into jeopardy of life or limb...." U.S. Const. amend. V. In *State ex rel. Moore v. Molpus*, 578 So.2d 624, 642 (Miss.1991), we held that:

> The public interest in stability and repose is so paramount that collateral estoppel protects competent judgments which are subsequently thought to be erroneous. *Where the elements of estoppel have been satisfied*, the court's inquiry is not whether the court's order was erroneous, but only that it was the final judgment of the case".... Our law rebuffs subsequent attempts to impeach or attach the initial judgment even where, for example (a) Additional evidence has been discovered, *Cotten v. Walker*, 164 Miss. 208, 224, 225, 144 So. 45, 47 (1932); (b) The substance of law has [been] incorrectly decided and applied, *Fisher v. Browning*, 107 Miss. 729, 739 66 So. 132, 136 (1914); or (c) Where constitutional questions have been erroneously decided.

(citation omitted & emphasis added)

¶38. The elements of collateral estoppel have not been satisfied in the instant case. The district attorney's office did not file a motion to intervene in the conservatorship. The issue tried in the Circuit Court of Forrest County was whether Ike Farris was guilty of conspiring with others to defraud the conservatorship of Jack Diamond. Whether Chancellor Taylor had exclusive jurisdiction to issue orders for attorney fees was a question of civil law, and as such, was independent from the criminal proceedings on the conspiracy indictment.

¶39. Collateral estoppel, as a defensive bar, does not apply in this case since the State was not a party to any civil suit against Farris. Moreover, the issues which were adjudicated in chancery court were not the same issues subsequently litigated in the circuit court trial. Finally, a final judgment of conspiracy was certainly not entered in the chancery court matters leading up to the issuance of the indictment. This assignment of error lacks merit.

### III. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT A CONTINUANCE UNTIL THE CHANCERY COURT RULED ON THE FINAL ACCOUNTING BY FARRIS.

¶40. Prior to trial, Farris requested a continuance of the criminal proceedings until the chancery court finally ruled on the conservatorship accounting he had filed shortly before the criminal trial began. Farris sought a chancery court determination that the fees he received from the Diamond conservatorship were not excessive. He now claims that refusing to grant the continuance prejudiced his defense and constitutes reversible error.

¶41. To preserve this issue on appeal, Farris was required to include the denial of the continuance in his motion for new trial. *Pool v. State*, 483 So.2d 331, 336 (Miss.1986). Farris's motion for new trial and for judgment notwithstanding the verdict made no mention of the continuance denial. Since this issue was not properly preserved, and because the trial court did not have the opportunity to rule on this claimed error, this issue is not properly before this Court and is therefore barred.

¶42. Ignoring the procedural bar, this claim also fails on the merits. Farris likens this issue to destruction of evidence, arguing that ex-parte communications between the Forrest County District Attorney's Office and Special Chancellor Shannon Clark show an intentional state action designed to deprive him of a possible exculpatory ruling by the chancery court on the reasonableness of his fees. Farris cites *Duplantis v. State*, 708 So.2d 1327, 1338 (Miss.1998), where we affirmed the denial of the defendant's motion to dismiss or in the alternative, to compel discovery of exculpatory evidence because the defendant failed to present any compelling evidence of fraud or intentional suppression of the truth by the State. Farris contends that the only exculpatory evidence was recognized and intentionally ignored by Chancellor Shannon Clark in a hearing. On the record, Chancellor Clark said, "the fees that were allowed by the Court [Chancellor Taylor] pursuant to Court Order - the amounts are all correct... I am not going to sit here and respond to questions by you about it that I know you are going to use or try to use [in the criminal proceeding]."

¶43. We were confronted with similar arguments in *Tolbert v. State*, 511 So.2d 1368 (Miss.1987), we held that the State's duty to preserve evidence is limited to evidence that is expected to play a significant role in the defense. To play a constitutionally significant role in the defense, the exculpatory nature must have been 1) apparent before the evidence was destroyed; and 2) of such a nature that the Defendant could not obtain comparable evidence by other reasonable means. *Id.* at 1372. We analyzed *Tolbert* in our *Duplantis* decision and found that plaster casts of tires and footprints would not have played a significant role for the defense because other physical evidence, consisting of fingerprints, established that the defendant had been at the crime scene. *Duplantis*, 708 So.2d at 1338. Physical evidence of a fireplace poker and shovel were also excluded in *Duplantis*, but we held that those potentially exculpatory items did not prejudice the defendant because the State Medical Examiner testified that a bolt-cutter, along with blood and tissue residue, was consistent with the injuries causing death to the victim in question. *Id*.

¶44. We find in the instant case that no evidence was destroyed under the first prong of *Tolbert*, a fact which Farris admits in his brief. Considering the second *Tolbert* factor, Farris was able to obtain and introduce comparable evidence of Chancellor Taylor's orders at trial which carried a civil presumption that he was properly paid for services rendered to the Diamond conservatorship. Farris argued throughout trial that these orders were exculpatory to the extent they were presumed valid. However, he failed to introduce these orders at trial, and he inconsistently objected when the prosecution offered them. This incongruity has been carried over to his brief on appeal and does not satisfy the second prong of *Tolbert*, since the final orders were available for his trial.

¶45. Trial courts have much latitude in deciding whether to grant continuances, and that decision is left to the sound discretion of the trial judge. *Lambert v. State*, 654 So.2d 17, 22 (Miss.1995). The granting of a continuance is within the sound discretion of the trial court, and the denial of a continuance motion will not be grounds for reversal unless it is shown to have resulted in manifest injustice. *Hatcher v. State*, 617 So.2d 634, 639 (Miss.1993); *see also* *Pinkney v. State*, 538 So.2d 329, 347 (Miss.1988). The trial court's denial of a continuance was not an abuse of discretion, and the record does not indicate any manifest injustice flowing from the denial of a continuance. This issue is without merit.

### IV. WHETHER THE TRIAL COURT ERRED IN OVERRULING THE FARRIS MOTION TO DISMISS BASED UPON IMMUNITY.

¶46. Farris further argues that unless the Forrest County District Attorney petitioned the Pearl River County Chancery Court and attacked the orders signed and approved by that court, he is immune from prosecution as a properly appointed guardian ad litem since Chancellor Taylor's orders are presumed valid on their face. As authority for this proposition, he cites Article 6, Section 159 of the Mississippi Constitution, which we have already addressed, and *Bryan v. Holzer*, 589 So.2d 648 (Miss.1991), where we noted:

> "It has long been settled that Chancery Courts in Mississippi which exercise jurisdiction over guardianships of minors and incompetents and their business have general and constitutional jurisdiction, and all facts necessary to sustain the jurisdictional decrees of such Courts are presumed to exist until the contrary appears in the record."

(quoting *Majors v. Purnell's Pride, Inc.*, 360 F. Supp. 328, 329 (N.D. Miss. 1973)).

¶47. Farris further cites *Herring v. Herring*, 571 So.2d 239 (Miss.1990), for the proposition that since his fees were approved by court order, and no attempt has been made to invalidate Chancellor Taylor's orders, then evidence which would render Chancellor Taylor's orders invalid is non-existent on appeal. He points to *Hinds County Bd. of Supervisors v. Common Cause*, 551 So.2d 107 (Miss.1989), and M.R.C.P. 60 (b), which outline the proper procedure for attacking the validity of a chancery court judgment. Farris's reliance on these authorities is misplaced.

¶48. *Common Cause* and Rule 60(b) both address the proper avenue for attacking chancery court judgments in *civil* matters. Today we are faced not with a civil matter, but with a criminal conspiracy case which was perpetrated through the veil of chancery court authority. A guardian ad litem does not enjoy immunity from our criminal law just because a chancellor has made the appointment and subsequently orders attorney fees. Any actor, regardless of official authority, who commits a crime against the peace and dignity of the State of Mississippi, and who is subject to the jurisdiction of this sovereign State, shall be held responsible for his actions according to the law of this State and the supreme law of the United States.

Miss. Const. Art. 6, § 156.

¶49. ***Herring*** involved the recusal of three sitting Chancellors from a child custody case where a Special Chancellor was appointed by a recusal order to hear the case. 571 So.2d at 239. Subsequent to the recusal order, one of the previously recused Chancellors stepped back into the fray and entered an order overruling a motion for his recusal. ***Id.*** at 241-42. We reversed and remanded, holding that, "In the absence of some valid order setting aside . . . [the original recusal order], the only person authorized to hear this case was [the Special Chancellor]." ***Id.*** at 243. We also held that the orders of the Special Chancellor were not subject to collateral attack. ***Id.***

¶50. ***Herring*** is distinguishable from the case sub judice. While Chancellor Taylor's orders pertaining to Ike Farris and the other indicted co-conspirators may have held a presumption of civil validity on their face, the indictment charged, and the prosecution proved beyond a reasonable doubt at trial, that the orders were a central part of the criminal conspiracy. We decline Farris's invitation to extend ***Herring*** and hold that fraudulent orders of a chancellor may not be reviewed in a circuit court criminal trial because of collateral estoppel, immunity of the guardian ad litem, or because a chancery court may have jurisdiction over a civil matter.

¶51. We fully accept the chancery court's subject matter jurisdiction over conservatorships under Article 6, § 159. But we can not ignore the circuit court's original jurisdiction over criminal matters under Article 6, § 156. The Mississippi Constitution also grants concurrent jurisdiction to the circuit court in matters of accounting for the money or property placed in the hands of a fiduciary.[1]

¶52. Although Farris correctly cites the procedure for civilly attacking a judgment of the chancery court, the prosecution did not attack an order of the chancery court on civil grounds. The focal point of the indictment charged a conspiracy to defraud the Diamond estate and to hinder the administration of justice. The judgments and orders of the chancery court relating to the accounting of Farris as the guardian ad litem did not cloak Farris with immunity from criminal prosecution. Farris's problem, in arguing that his actions were approved by the chancery court, is that Chancellor Taylor's involvement as an unindicted co-conspirator hung a dark shadow upon the chancery court orders and greatly diminished the credibility of Ike Farris in front of the jury. This argument is without merit.

> **V. WHETHER THE TRIAL COURT ERRED IN RULING THAT THE CONSPIRACY AS CHARGED IN THE INDICTMENT WAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE, THEREBY RESULTING IN THE ADMISSION OF EVIDENCE FROM CO-CONSPIRATORS.**

¶53. The State called Jay Jernigan, a former guardian ad litem and conservator of the Diamond estate, as its first witness. Jernigan testified at length about the various events leading up to Chancellor Taylor's suicide and the conspiracy indictment against Ike Farris and the other alleged co-conspirators. Since the preliminary ruling on a conspiracy involving Ike Farris was based upon the testimony of Jay Jernigan, we must first examine a chronological synopsis of his testimony:

¶54. Direct examination (by assistant district attorney Helfrich) revealed the following:

•At various times, Jernigan acted as the guardian ad litem and conservator for the Diamond estate.

•Diamond had a stroke, was non-communicative and was fed by a tube.

•A contract existed between the conservatorship and a home health agency in Picayune, Mississippi, providing Mr. Diamond with sitters twenty-four hours a day.

•Diamond owned Allied Heirlooms, a very lucrative wedding gown cleaning and storage business in Picayune, Mississippi.

•Jernigan identified various documents, including a petition by Sam Farris, brother of Ike Farris, to purchase Allied Heirlooms on behalf of Manhattan Square Limited Partnership.

•Jernigan identified a second document filed by Sam Farris on behalf of Manhattan to examine the books of Allied Heirlooms.

•Jernigan identified a third document, which consisted of an order signed by Chancellor Taylor directing the guardian ad litem to obtain medical and psychological reports from a doctor on the condition of Diamond. He testified that the order was made upon a motion filed by Sam Farris on behalf of Manhattan.

•Jernigan identified a petition that he filed appointing Horne CPA Accounting Group, of Hattiesburg, Mississippi to conduct a financial evaluation of Allied Heirlooms.

•Jernigan testified that a financial evaluation of Allied Heirlooms was conducted by Horne CPA Accounting Group in 1995. Thereafter, Greg Anderson, a Horne employee, estimated the value of Allied to be between 2.8 and 3 million dollars.

•Jernigan informed Chancellor Taylor of the amount that Greg Anderson had evaluated for Allied and testified that Taylor was shocked.

•Jernigan was appointed conservator for the Diamond estate on October 10, 1995.

•Carley Cooper was the conservator prior to Jernigan.

•A meeting was called in Picayune, Mississippi, by Jack Parsons, attorney for Susan Williams, daughter of Jack Diamond.

•Carley Cooper, then conservator, had entered into a contract with Susan Williams (Diamond's daughter) to buy Allied Heirlooms from Ms. Williams upon the death of Jack Diamond.

•Jernigan identified the order appointing Ike Farris as guardian ad litem on October 12, 1995.

•Jernigan identified an order signed by Chancellor Taylor requiring himself and Bryan O'Rourke sign any and all checks from the conservatorship.

•Jernigan identified a petition he filed on November 21, 1995, authorizing payment of fees and expenses to Ike Farris, Jay Jernigan and Bryan O'Rourke.

•Jernigan identified an order approving the petition filed on November 21, 1995.

•Jernigan described his reasons for leaving the position as conservator as being a conflict of interest in Brian O'Rourke's dual representation as Chief Financial Officer of Allied Heirlooms and O'Rourke's

continued representation of Manhattan Limited as a potential purchaser of the same business. Jernigan also testified that the kickback solicitations Chancellor Taylor made to him played a part in his decision to resign as conservator.

•Jernigan described Chancellor Taylor requesting kickbacks between June and November of 1995.

•Jernigan submitted his resignation as conservator on December 15, 1995.

•Jernigan testified that Greg Alston presented him with a prepared letter of resignation, requesting that Jernigan sign the letter and base his resignation as conservator on "personal reasons." Jernigan refused to sign the letter.

•Jernigan testified that he told Greg Alston that there were some "problems with the estate and told him not to be involved in it."

•Jernigan described approaching Assistant District Attorney Rex Jones of the Forrest County District Attorney's Office in November of 1996 regarding the attempted kickback requested by Chancellor Taylor.

¶55. Cross-examination (by Klein, counsel for Farris) revealed the following facts:

•Jernigan testified that he charged the Diamond estate $125 per hour in his capacity as guardian ad litem.

•Jernigan testified that Ike Farris charged the Diamond estate $100 per hour.

•Jernigan testified that he remained in a fiduciary capacity with the Diamond estate for six (6) months after Chancellor Taylor initially requested a kickback.

•Jernigan admitted that he did not tell Ike Farris about the requested kickbacks from Chancellor Taylor, but said there were good reasons why he did not tell Farris. Counsel for Farris declined to inquire as to the reasons.

¶56. The State then requested a preliminary ruling as to whether it had established a conspiracy for purposes of introducing statements of co-conspirators under M.R.E. 801 (d)(2)(E). The pertinent dialogue in the record is as follows:

Mr. Klein: We don't have a problem with you [the court] making a ruling at this point with regard to a conspiracy existing. Obviously we want to reserve any objections that we may have regarding the conspiracy and its alleged participants, but I don't have any problem with you making a ruling, if that's what I think Bob's [the prosecutor] trying to do.

The Court: I think the testimony of Jernigan at the present time has been sufficient circumstantial evidence to indicate a conspiracy and that it's reasonable to draw a conclusion at this time that the defendant [Ike Farris] was part of that conspiracy for the purposes of ruling. I say that without consideration to the fact that on opening statement you [Klein], in fact, implied that there was a conspiracy, but you would deny that the defendant [Farris] was part of that conspiracy. I think that without finding as such, there is sufficient evidence at this time to warrant the conspiracy statements, if that's what you're referring to.

The record reflects that counsel for Farris admitted a conspiracy existed between Chancellor Taylor, Charlie Morgan, Scott Morgan, and Greg Alston, but made a continuing objection as to the absence of a proper foundation on the existence of a conspiracy which included Ike Farris. Farris argues that since the trial court erred in ruling that the prosecution met its preliminary burden of establishing Ike Farris as a co-conspirator through Jernigan's testimony, any subsequent evidence or testimony regarding the statements of other co-conspirators was improperly admitted under M.R.E. 801(d)(2)(E).

## A. Standard of Review

¶57. Whether Farris waived the objection is not dispositive of the real issue: Was there sufficient evidence from Jernigan's testimony that would have allowed a reasonably prudent juror to conclude that Ike Farris was a member of the conspiracy as alleged in his indictment? The standard of review in Mississippi for questions of law is de novo. *Mississippi Transp. Comm'n v. Fires*, 693 So.2d 917, 920 (Miss.1997). The standard of review from evidentiary rulings is prescribed by Miss. R. Evid. 103(a): "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." We have held that the "[a]dmission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So.2d 200, 210 (Miss.1998) (quoting *Sumrall v. Mississippi Power Co.*, 693 So.2d 359, 365 (Miss.1997)). In applying the standard, the reviewing court may reverse a case only if "the admission or exclusion of evidence.... result[s] in prejudice and harm or adversely affect[s] a substantial right of a party." *K-Mart Corp. v. Hardy*, 735 So.2d 975 (Miss. 1999) (citing *Hansen v. State*, 592 So.2d 114, 132 (Miss.1991)).

## B. The Law of Conspiracy: Preliminary Findings on Evidence

¶58. Miss. Code Ann. § 97-1-1 (1998) states in pertinent part:

If two (2) or more persons conspire either:

(a) To commit a crime; or

. . .

h) To accomplish any unlawful purpose, or a lawful purpose by any unlawful means: such persons, and each of them, shall be guilty of a felony....

We have defined the crime of conspiracy as follows: "Conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy. The offense is complete without showing an overt act in the furtherance of the conspiracy." *Griffin v. State*, 480 So.2d 1124, 1126 (Miss.1985). The parties to the conspiracy must understand that "they are entering into a common plan and knowingly intend to further its common purpose." *Id*. And finally, "[t]he agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators." *Id*. *See also Clayton v. State*, 582 So.2d 1019 (Miss.1991).

¶59. In *Davis v. State*, 485 So.2d 1055, 1058 (Miss.1986), we further stated that "[i]t is settled that the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial

evidence...." However, merely associating with conspirators does not make one a co-conspirator. "There must exist some evidence that a defendant has associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed." *Id*.

¶60. An out-of-court statement is not hearsay if the statement is "offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Miss. R. Evid. 801(d)(2)(E). We have held that before a co-conspirator's testimony can be admitted under Rule 801(d)(2)(E), the prosecution has the burden of establishing the preliminary fact of a conspiracy. *Tavares v. State*, 725 So.2d 803, 809 (Miss.1998)(citing *Ponthieux v. State*, 532 So.2d 1239, 1244 (Miss.1988)). Farris complains that his admission of a conspiracy between all of the co-conspirators except himself was not enough. He argues that the State was required to establish proof of a conspiracy which included him before extraneous statements of co-conspirators could qualify for admission as non-hearsay under M.R.E. 801(d)(2)(E).

¶61. If at the close of Jernigan's testimony the trial court had ruled there was insufficient evidence to establish a conspiracy which included Ike Farris, the State would have doubtlessly continued calling witnesses and introducing incriminating evidence, independent of M.R.E. 801(d)(2)(E), until the trial judge was satisfied that Farris was a co-conspirator. But timing is not necessary to our determination of this issue. The Fifth Circuit has held that "the conspiracy that forms the basis for admitting co-conspirators' statements need not be the same conspiracy for which the defendant is indicted." *United States v. Arce*, 997 F.2d 1123,1128 (5th Cir.1993). Because Farris admitted that a conspiracy existed between all of the co-conspirators named in the indictment, excluding himself, his omission in the admitted conspiracy does not necessarily preclude the M.R.E. 801(d)(2)(E) statements at issue.

¶62. Under Rule 104(a) of the Mississippi Rules of Evidence, a court "is not bound by the rules of evidence except those with respect to privileges" in determining the existence of preliminary facts to support the admission of evidence. *See also Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); Graham, Federal Practice & Procedure, Interim Edition, Evidence, § 6725. The prosecution is entitled to offer evidence at trial of a plan and motive, thereby invoking M.R.E. 104, to establish the admissibility of M.R.E. 801(d)(2)(E) statements by showing that a conspiracy preceded consummation of the principal offense, i.e., defrauding the Diamond conservatorship. *Ponthieux*, 5 32 So.2d at 1244. While the trial court is ordinarily limited to the evidence offered at the Rule 104 hearing, on appeal we will search the entire record in determining whether the preliminary fact of conspiracy has been established. *Id.* "It is to the entire record that we employ a clearly erroneous standard of review." *Id.*

¶63. While the entire record shows substantial evidence of Ike Farris acting as a confederate in the Diamond conspiracy, we need not belabor those facts here. The State offered evidence through Jernigan that Chancellor Taylor had solicited information from Sam Farris about selling Allied Heirlooms and that, as early as October of 1995, Chancellor Taylor informed Jernigan that Ike Farris would be appointed guardian ad litem. The fraternal relation between Ike Farris and his brother Sam was not independently sufficient to establish Ike Farris as a co-conspirator because guilt by mere association is not enough. *Davis*, 485 So.2d at 1058. However, Chancellor Taylor did not force Ike Farris to accept the role of guardian ad litem.

¶64. Ike Farris voluntarily associated himself with the conservatorship, and Chancellor Taylor's declaration to Jernigan that Farris would be appointed could hardly be viewed as an uninformed prediction or unilateral

decision. A statement which identifies the role of one co-conspirator to another falls within the purview of "furthering a conspiracy." M.R.E. 801(d)(2)(E); s*ee, e.g.*, *United States v. Magee*, 821 F.2d 234, 244 (5th Cir.1987). Without the willingness of Ike Farris to participate in the conservatorship conspiracy through his official actions as guardian ad litem, Chancellor Taylor would have been left with little reason to convey such delicate information to another officer of the court who had been the unenviable recipient of kickback solicitations.

¶65. Jernigan's testimony also reflects that Chancellor Taylor's kickback solicitations coincided with his appointment of Ike Farris as guardian ad litem and continued for a month and a half while Farris served in that official capacity. Statements conveying information which could have been intended to affect future dealings between the parties falls within the realm of "furthering a conspiracy." M.R.E. 801(d)(2)(E); *see, e.g.*, *United States v. Patton*, 594 F.2d 444, 447 (5th Cir. 1979). Because Chancellor Taylor informed Jernigan of the impending appointment of Ike Farris as guardian ad litem during the same time period when Chancellor Taylor was soliciting kickbacks from Jernigan, these statements obviously related to information which was intended to further conspiratorial dealings between Ike Farris and Chancellor Taylor.

¶66. The totality of these facts demonstrates an implied agreement between Chancellor Taylor and Ike Farris. This agreement was inferred by the circumstances of their declarations, conduct and official relationship under authority of the Forrest County Chancery Court. *See Griffin*, 480 So.2d at 1126. While it is a close call, we hold that Jernigan's testimony was independently sufficient to establish a conspiracy which included Ike Farris.

¶67. The timing of a conspiracy ruling may be critical in cases where the evidence of guilt is primarily based on statements of co-conspirators, but the timing in this case was inconsequential. In light of Jernigan's testimony concerning the other co-conspirators and Ike Farris, a reasonably prudent juror could have easily concluded that Farris was part of a conspiracy to defraud the conservatorship of Jack Diamond. We hold that the preliminary trial court determination is without error when viewed through the lens of the "clearly erroneous" appellate standard set forth in *Ponthieux*. This issue consequently fails.

## VI. WHETHER THE TRIAL COURT ERRED IN ADMITTING HEARSAY TESTIMONY.

¶68. Farris next complains that Byran O'Rourke's conversations with Chancellor Taylor, Charlie Morgan and Greg Alston were inadmissible hearsay not falling within an exception. Farris also takes exception to Gene Combs's testimony about statements made by Greg Alston and Chancellor Taylor.

¶69. The prosecution was allowed to introduce testimony from Jay Jernigan that Chancellor Taylor, on four or five occasions in 1995, had instructed Jernigan to pad his legal bills and pay part of the excess fee to the judge. Chancellor Taylor told Jernigan on several occasions that he needed $3,000 and implied that Jernigan should over bill the conservatorship to pay the kickback.

¶70. Prosecution witness Gene Combs testified that when he approached Chancellor Taylor about purchasing Allied Heirlooms, late in the year of 1995, Taylor told him that one-third of the business would have to be set aside for his personal benefit. Combs was also allowed to testify that shortly after Chancellor Taylor's solicitation, Greg Alston told him that one-third of the sale price of the business would have to be retained for the Chancellor. Ike Farris objected to these out-of-court statements and filed a motion in limine to bar the evidence. The motion and objections were overruled by the trial court.

¶71. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." M.R.E. 103(a). Admission or suppression of evidence is within the sound discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Sumrall v. Mississippi Power Co.*, 693 So.2d 359, 365 (Miss.1997). We will reverse a case under that standard only when "[t]he admission or exclusion of evidence . . . result[s] in prejudice and harm or adversely affect[s] a substantial right of a party." *Hansen v. State*, 592 So.2d 114, 132 (Miss.1991).

¶72. O'Rourke's testimony principally dealt with an in camera hearing he attended on January 16, 1996, that included Chancellor Taylor, Greg Alston, Ike Farris, Charlie Morgan, and Todd Bradley. O'Rourke also testified about a closed-door meeting immediately after the hearing which included all of the people in the hearing except Todd Bradley. O'Rourke testified that on the motion of Sam Farris, Chancellor Taylor appointed him chief financial officer of Allied Heirlooms the very first time he met O'Rourke in court --- in October of 1995. O'Rourke's court appointment coincided with his continued representation of Manhattan Square Limited Partnership, and Sam Farris in negotiations to purchase Allied Heirlooms. The combined effect of this testimony inferred that a conspiracy was afoot before O'Rourke even appeared in the Forrest County Chancery Court or had occasion to meet Chancellor Taylor.

¶73. Although Ike Farris testified that his only responsibility as guardian ad litem was to protect Jack Diamond and his home, he issued a subpoena duces tecum mandating that Greg Anderson supply a business valuation of Allied Heirlooms at the January 16 meeting. The record indicates that when Ike Farris issued this subpoena with Chancellor Taylor's seal, he was fully aware that his brother, Sam Farris, was representing Manhattan Square Limited in a pending offer to buy Allied Heirlooms for $700,000. Ike Farris recognized that O'Rourke was also working as a financial consultant for Manhattan Square Limited in tandem with Sam Farris. O'Rourke testified that Greg Anderson later submitted the financial valuation pursuant to the subpoena issued by Ike Farris and signed by Chancellor Taylor. When Anderson presented the business valuation in the closed-door meeting, Ike Farris questioned him at length over financial details relating to Allied Heirlooms and repeatedly asked whether anyone else had looked at the documents. O'Rourke testified that Ike Farris was present when Charlie Morgan requested that the Allied Heirlooms bank accounts be transferred from Picayune to Hattiesburg for supposedly confidential legal reasons. Todd Bradley and other employees at Allied knew of the excessive attorneys fees and expenses which were draining the business, and O'Rourke testified that Ike Farris and others present at the closed-door meeting were aware of these circumstances. When Charlie Morgan related his supposed fears over the "death threats" against Jack Diamond and O'Rourke offered the simple suggestion of notifying the Picayune Police Department, Ike Farris remained strangely silent since he knew of the security arrangement between Scott Morgan and the conservatorship but had failed personally to contact the local police as guardian ad litem.

¶74. After the closed-door meeting Ike Farris told O'Rourke that he was making him look bad because O'Rourke was not billing the conservatorship for enough money. Whether Farris was joking with O'Rourke about the fees in this instance was merely a question of fact or credibility for the jury, but the statement was clearly admissible as an admission by a party-opponent under M.R.E. 801(d)(2)(A). As such, O'Rourke's testimony was not dependent upon whether Ike Farris was a co-conspirator for statements under M.R.E. 801(d)(2)(E). The totality of these statements provided critical guidance to the jury about when and why the various co-conspirators knew of this delicate information concerning the conservatorship.

¶75. The testimony offered by O'Rourke concerning the statements of the other co-conspirators, indicted or otherwise, was admissible as existing during the course of the conspiracy and in furtherance of it. M.R.E.

801(d)(2)(E). Relevant and otherwise admissible evidence must still pass through the filter of M.R.E. 403. Besides asking repeatedly whether anyone had seen the business valuation of Allied Heirlooms, Ike Farris was present during the entire meeting and noticeably declined to speak or ask about anything other than Allied's financial details. The probative value of the statements, largely made by other co-conspirators, was very helpful in demonstrating the mechanics of the conspiracy to the jury, and as such, was not substantially outweighed by the danger of unfair prejudice to Ike Farris. A statement soliciting a bribe is not hearsay. *United States v. Moss*, 9 F.3d 543,550 (6th Cir.1993); *United States v. Villarreal*, 764 F.2d 1048, 1050 n.2 (5th Cir.1985). Chancellor Taylor's bribe solicitation was not offered to prove the truth of the matter asserted. His testimony was offered to prove the act of solicitation, not that Chancellor Taylor specifically needed $3,000. Even though these solicitation attempts are not hearsay, they must still be relevant to be admissible. Even if relevant, M.R.E. 403 prohibits the introduction of evidence if the probative value of the testimony is substantially outweighed by its prejudicial effect.

¶76. Chancellor Taylor's statements to Jernigan in which he attempted to solicit a kickback happened between June and November of 1995. Chancellor Taylor appointed Ike Farris as guardian ad litem on October 12, 1995, two days after Chancellor Taylor appointed Jernigan conservator. Since the dates of the Chancellor Taylor's solicitations for kickbacks coincided with Ike Farris's appointment and service as guardian ad litem, the testimony relating to Chancellor Taylor's kickback solicitations was highly relevant to the timing, motives, opportunities and identities of the co-conspirators.[2] For example, Chancellor Taylor's kickback solicitations to Jernigan established that the Chancellor had an opportunity to wield virtually unbridled power from the bench by approving excessive attorney's fees in exchange for a kickback. The probative value of the testimony was not outweighed by the danger of unfair prejudice since Ike Farris and Jay Jernigan were both acting in important fiduciary capacities before Chancellor Taylor and the Forrest County Chancery Court at the time of at least one of the Chancellor's kickback solicitations to Jernigan. M.R.E. 403.

¶77. Ike Farris testified that he submitted bills to Greg Alston, that Alston would in turn submit those bills, along with other expenses, to Charlie Morgan and Chancellor Taylor for payment. Alston's solicitation to Gene Combs was not offered as proof of the matter asserted ---that Chancellor Taylor actually needed one-third of the purchase price of Allied Heirlooms. Alston's solicitation was offered to show his personal knowledge of the over billing scheme and how his act of solicitation on behalf of Chancellor Taylor independently furthered the conspiracy.

¶78. Alston's capacity as attorney for the conservatorship provided the primary means by which Ike Farris was paid. Alston solicited a kickback for Chancellor Taylor in late 1995. This solicitation coincided with Ike Farris assuming the role of guardian ad litem on October 12, 1995, and maintaining that official position through the end of November, the last date identified in testimony of Chancellor Taylor's seeking a kickback from Jay Jernigan. After Jernigan resigned his position as conservator on December 15, 1995, Farris and Alston continued in their respective capacities throughout the year of 1996.

¶79. The existence of these common fiduciary relations during Alston's kickback solicitation to Combs, on behalf of Chancellor Taylor, was highly probative of several related factors (planing, timing, motives, opportunities, identities and knowledge) involving the co-conspirators. Ike Farris and Greg Alston were jointly acting in official capacities during this time as the respective guardian ad litem and attorney for the conservatorship. Therefore, the probative value of Alston's solicitation was not outweighed by the danger of unfair prejudice to Ike Farris under M.R.E. 403.

¶80. We have held that once a conspiracy is established, a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy is admissible against each conspirator, notwithstanding the confrontation clause or hearsay rule. *Ponthieux v. State*, 532 So.2d at 1243. Statements made by co-conspirators in furtherance of the conspiracy are considered non-hearsay by definition. M.R.E. 801(d)(2)(e). We hold that the statements at issue occurred in the course of the conspiracy and in furtherance of the conspiracy with Ike Farris. This issue fails.

### VII. WHETHER THE TRIAL COURT ERRED IN ADMITTING SUMMARY EVIDENCE PRESENTED BY THE STATE.

¶81. Prior to trial, counsel for Farris filed a motion in limine regarding summary evidence. The motion was overruled, and Farris argues that the trial court erred in allowing the State to present summaries of payments made from the Diamond estate which had no probative value and prejudiced the jury against Farris. Farris alleges that the trial court mistakenly allowed the State to submit summaries which contained false or misleading evidence.

¶82. The record reflects some mistakes were initially made in the summary evidence charts offered by the State. The trial court noted the mistakes and instructed the prosecution to make the proper corrections. The record reflects these mistakes were corrected by introducing the conservatorship checkbook. Summaries of voluminous evidence are admissible under M.R.E. 1006, according to the trial court's discretion. Reversal of a trial court's evidentiary findings may only occur when there is a demonstrable abuse of the trial court's discretion. *Johnston v. State*, 567 So.2d 237, 238 (Miss.1990). Finding no such abuse of discretion, the issue fails.

### VIII. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF PAYMENTS MADE PRIOR TO THE ISSUANCE OF THE CHANCERY COURT ORDER.

¶83. Uniform Chancery Court Rule 6.12 requires that every petition by an attorney seeking fees for services rendered must establish that the services have been rendered, and the fees must be approved by the Chancellor. In civil cases, we have recognized that an attorney can be paid from estate funds without prior court approval; however, the attorney does so subject to the peril of having the fee later disapproved by the Chancellor. *In re McCaffrey*, 592 So.2d 52, 63 (Miss.1991). The penalty of such disapproval in a civil case is repayment rather than criminal sanctions. *Id.*

¶84. This is not a civil case. While all of the fees paid to Ike Farris were approved by Chancellor Taylor's orders, Farris received several checks for services he supposedly rendered to the Diamond estate before Chancellor Taylor entered an order approving the fees. The system Farris established to collect his fees, i.e., using Greg Alston and Charlie Morgan as a go-between for Chancellor Taylor's approval, demonstrated a small but important connection in the larger conspiracy to defraud the Diamond estate. The evidence was relevant, admissible and within the trial court's discretion. This issue fails.

### IX. WHETHER THE TRIAL COURT ERRED IN DENYING THE FARRIS MOTION TO RECUSE THE DISTRICT ATTORNEY.

¶85. In this assignment of error, Farris alleges that the trial court erred in failing to sustain his motion for the District Attorney's office recusal from prosecution in this case. As grounds for the motion, Farris argued that

assistant district attorney Rex Jones engaged in ex parte communications with Special Chancellor Shannon Clark over a potential claim by the Diamond estate against Linda Humphrey for overbilling. Special Chancellor Clark admitted to the ex parte communications, but noted instead that he could be subpoenaed as a witness. Farris also argues that the Forrest County District Attorney's Office improperly intervened in the Diamond conservatorship proceedings before the Pearl River County Chancery Court. However, Farris did not allege that the trial court erred in failing to recuse the district attorney in his motion for a new trial. He is consequently barred on appeal for failure to renew his motion. *Wetz v. State*, 503 So.2d 803, 808 (Miss.1987). Even though procedurally barred, this assignment of error is without merit.

¶86. Linda Humphrey was the former sister-in-law of District Attorney Lindsay Carter and served as Chancellor Taylor's court reporter during the entire Diamond conservatorship saga. The record reflects that a private attorney, not the Forrest County District Attorney's Office, filed a petition to intervene in the Diamond Conservatorship before Pearl River County Chancery Court. The basis of the petition was for the Diamond conservatorship to settle any potential claims against Linda Humphrey for a billing mistake she made in providing court transcripts. A corresponding order filed by the District Attorney does not exist in the record. The Special Chancellor held that the final accounting of Ike Farris with the Pearl River County Chancery Court and Humphrey's repayment to the Diamond estate were two separate matters.

¶87. As an example of a conflict requiring recusal of a district attorney, Farris relies on *Wagner v. State*, 624 So.2d 60 (Miss.1993), where the prosecutor had previously represented the defendant as court-appointed counsel prior to working for the State. Wagner is distinguishable to the instant case because there was no evidence offered by Farris, other than a billing mistake reported to authorities, that Linda Humphrey was part of the conspiracy. Prosecutors have wide discretion in deciding what actions will be prosecuted, and the person claiming selective prosecution carries the burden of showing that they were arbitrarily or unconstitutionally targeted. *Hanzen v. State*, 592 So.2d 114, 143 (Miss.1991). The trial judge was within his discretion to hold that recusal of the assistant district attorney was unnecessary and that the Forrest County District Attorney's Office did not improperly intervene in the Pearl River County Chancery Court on behalf of Linda Humphrey. This issue fails.

### X WHETHER THE TRIAL COURT ERRED IN RULING THAT THERE WAS NO EVIDENCE OF SELECTIVE PROSECUTION.

¶88. The trial court found no evidence of selective prosecution, and the finding is accorded great deference by this Court. In *Watts v. State*, 717 So.2d 314, 320 (Miss.1998), we followed the rationale of *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), holding that, "[i]t is a fundamental principle of our criminal justice system that a prosecutor is afforded prosecutorial discretion over what charge to bring in any criminal trial."

¶89. Farris relies on *In re Moore*, 722 So.2d 465 (Miss.1998), where we granted a writ of mandamus requiring a circuit judge to re-incarcerate an inmate, thereby voiding the lower court's prior order of release. The inmate pled that to return him to prison would be a violation of his equal protection rights since he was the only person to be re-incarcerated among others who had been released under Miss. Code Ann. § 47-7-47, and the circuit agreed. However, there was no showing that the action against the defendant was motivated by a discriminatory purpose. We relied on *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)(Government's passive enforcement policy, under which it prosecuted only those who reported themselves as having violated the law, or who were reported by others, did not violate

the First or Fifth Amendments) and held the release void for lack of a selective prosecution violation.

¶90. The same rationale applies in the case sub judice. There was no showing that Farris was chosen for indictment in a criminal prosecution rather than Linda Humphrey. Farris was charged with being a member of an ongoing conspiracy instead of a bad accountant. While there may have been grounds for a criminal prosecution in the case of Humphrey, according to *Batchelder*, that was the call of the District Attorney. This issue fails.

### XI. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING THE FARRIS MOTION FOR A DIRECTED VERDICT, A JNOV OR A NEW TRIAL.

¶91. In the companion case of *Morgan v. State*, 741 So.2d 246 (Miss. 1999), although we reversed and remanded for a new trial, we found that the State had established a conspiracy to defraud the Diamond conservatorship, thereby upholding the weight and the sufficiency of the evidence for Scott Morgan's conviction. Ike Farris and Scott Morgan were named in the indictment as co-conspirators, and both were convicted at trial, but we must independently review this issue in the instant case.

¶92. We have settled the standard of review for each of these issues. A motion for a new trial asks us to vacate the jury's guilty verdict on grounds related to the weight, not the sufficiency, of the evidence presented at trial. *May v. State*, 460 So.2d 778, 781 (Miss.1984). "We will not order a new trial unless convinced that the verdict is so contrary to the weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Groseclose v. State*, 440 So.2d 297, 300 (Miss.1983). We will reverse the lower court's denial of a motion for a new trial only if the court abused its discretion. *Gleeton v. State*, 716 So.2d 1083, 1089 (Miss.1998). Moreover, we are to consider all of the evidence in the light most favorable to the prosecution, accepting all credible evidence consistent with the verdict as true. *Ashford v. State*, 583 So.2d 1279, 1281 (Miss.1991).

¶93. Matters regarding the weight and credibility of the evidence must be resolved by the jury. *Fisher v. State*, 481 So.2d 203, 212 (Miss.1985). Our authority to interfere with a jury's verdict is quite limited when a defendant challenges the legal sufficiency of the evidence. *McFee v. State*, 511 So.2d 130,133 (Miss.1987). We consider *all of the evidence* in the light most consistent with the verdict and give the prosecution the benefit of all favorable inferences. *Id*. Only if reasonable men could not have found beyond a reasonable doubt that the defendant was guilty will we reverse. *Id*.

¶94. While ample evidence of Ike Farris being a co-conspirator was introduced by several State witnesses, the most damning testimony came from Ike Farris himself. Ike Farris testified that he understood why Jernigan petitioned the court for removal of Carley Cooper as conservator: Cooper was in a conflict of interest with the conservatorship because he was contracting with Diamond's daughter and sole heir to purchase Allied Heirlooms while under ethical and fiduciary duties to preserve the best interest of Diamond's conservatorship. If Farris understood that conflict of interest, any reasonable juror could conclude that he should have also recognized the severe conflict of interest between his position as guardian ad litem for Diamond and the efforts of Sam Farris to purchase Allied Heirlooms through Manhattan Limited Partnership.

¶95. In the early spring of 1996, Ike Farris and others decided that two sports cars owned by Diamond, a Ferrari and a Mazzerati, should be sold supposedly to finance the purchase of a wheel-chair equipped van for Jack Diamond. As guardian ad litem, Farris had the insurance for the cars in his name and removed the

cars from Diamond's house to sell them. Farris testified that he, along with fellow co-conspirator Scott Morgan, drove the cars "around the block a couple of times to try and build the battery up." While the record is not clear as to the extent of the co-conspirators' use of the two sports cars, one fact is very clear: The Diamond conservatorship generated plenty of money for attorneys fees, and the purchase of a wheel-chair van was not financially contingent upon whether the two cars could be sold. Farris admitted that a wheel-chair van was in fact purchased before the two cars were sold. Based on this testimony, a juror could have easily concluded that the real reason Ike Farris and Scott Morgan used these cars was for their personal pleasure rather than for Jack Diamond's best interests.

¶96. Ike Farris acknowledged that he was responsible for taking care of Diamond's personal interests and his home and that he had full access to the conservatorship court file, but Farris never bothered to question the fact that Scott Morgan's supposed security services were excessive and unnecessary. Farris knew of the conflict of interest between Charlie Morgan as conservator and the security fees which were paid to his son, Scott Morgan, and Farris did absolutely nothing to intervene. Instead, Farris made at least 107 trips from Hattiesburg to Picayune for menial reasons such as checking Jack Diamond's house gutters, bringing food and diapers, and observing the general demeanor of Diamond and the health care workers. A health care aide for Diamond testified that Farris was bringing so much food that much of it was beginning to ruin. Farris charged his customary fee of $100 an hour for each trip, and he admitted that the majority of this pay was for his travel time.

¶97. Ike Farris testified that he had access to the conservatorship court file during the entire year of 1996. In that year, the Diamond conservatorship was billed for over $218,000 by Ike Farris, Greg Alston, Charlie Morgan and Scott Morgan. Ike Farris admitted that although he was supposed to be looking out for Jack Diamond's best interests, he never once looked at the court file during 1996 or questioned whether the various fees were necessary.

¶98. The most glaring inconsistency surrounds the supposed death threats against Jack Diamond. Chancellor Taylor told Farris that someone was trying to kill the bed-ridden ward and that Farris should carry a gun with him on each trip to Picayune. Testimony revealed that the Picayune Police Department was only a few blocks from Diamond's home. Farris turned a blind eye toward the bogus "security services" supposedly rendered by Scott Morgan, which cost over $45,000 in 1996, but he never once notified the Picayune Police Department, the Pearl River County Sheriff's Department, or any other law enforcement agency of the purported death threat.

¶99. Ike Farris overbilled the conservatorship for needless services. He shifted his billing responsibility to Greg Alston and Charlie Morgan in hopes of hiding behind their respective inexperience and feebleness. Knowing that his brother was representing potential bidders on Allied Heirlooms, he continued to do all of these corrupt things despite the blatant conflict of interest. He used Chancellor Taylor's orders and directives as a license to steal.

¶100. As guardian ad litem, Ike Farris was an officer of the court and assumed a duty to assert every obligation of good faith and protective diligence in the best interests of Jack Diamond. Warner's Griffith, Mississippi Chancery Practice § 532 (1991). Fiduciary obligations as guardian ad litem, if anything, demanded that Farris investigate, report and protect Diamond's person and his interests. *Id.* The facts available to Ike Farris placed him on notice that he should have either resigned as guardian ad litem due to a conflict of interest, taken steps to intervene against his other partners in crime, or both. Miss. R. Prof.

Conduct [1.07](#) & [8.3](#).

¶101. Considering all of the evidence in the light most favorable to the prosecution, we cannot hold that Farris was entitled to a JNOV or a new trial. The weight and sufficiency of all the evidence was considered by the jury. Any reasonable juror could have easily concluded that Ike Farris was guilty of conspiring to defraud the conservatorship of Jack Diamond. This issue fails.

## CONCLUSION

¶102. The legal profession has come under increased scrutiny in recent years as a result of a few unethical attorneys. But when an attorney travels beyond unethical conduct and engages in illegal activity, all members of this honorable profession suffer -- whether it be in national media, churches, classrooms, courtrooms, local coffee shops or even in our own conscience. This shameful saga of dishonesty, greed and vice casts a long shadow on the integrity of our judicial system. That shadow will always remain where we have corrupt judges and officers of the court who ignore the moral compass of our law, the very bedrock foundation of our republic, by succumbing to the heart of darkness.

¶103. Today we affirm the conviction of Ike Farris, not because we want to change public perception or "send a message", but because the letter of the law was followed at trial and justice prevailed over wrong. The judgment of the Forrest County Circuit Court is affirmed.

¶104. **CONVICTION OF CONSPIRACY AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TWO (2) YEARS SUSPENDED ON TWO (2) YEARS UNSUPERVISED PROBATION UNDER THE TERMS AND CONDITIONS SET FORTH IN SECTION 47-7-35, MISSISSIPPI CODE OF 1972, AS AMENDED, AND THREE (3) YEARS TO SERVE, PAY A FINE OF $5,000.00 AND ALL COURT COSTS, AND DISBARMENT FROM THE FURTHER PRACTICE OF LAW IN THE STATE OF MISSISSIPPI AS SET FORTH IN SECTION 73-3-41 OF THE MISSISSIPPI CODE OF 1972, AS AMENDED, AFFIRMED**.

**PRATHER, C.J., BANKS, P.J., McRAE, SMITH, WALLER, COBB AND DIAZ, JJ., CONCUR. PITTMAN, P.J., NOT PARTICIPATING.**

1. "And the chancery court shall have jurisdiction, concurrent with the circuit court, of suits on bonds of fiduciaries and public officers for failure to account for money or property received, or wasted or lost by neglect...." Miss. Const. art. 6, § 161.

2. We are not unaware of the inconsistency between the facts as set forth in the instant record and the facts set forth in the companion case of *[Morgan v. State](#)*, 741 So.2d 246 (Miss. 1999). Individual cases must stand on the facts of their respective records, and the law must accordingly be applied separately, but consistently, to each particular case.