624 So.2d 60 (1993)
Darrell Joe WAGNER
v.
STATE of Mississippi.
No. 90-KA-0837.
Supreme Court of Mississippi.
August 19, 1993.
*61 James L. Davis, III, Gulfport, for appellant.
Michael C. Moore, Atty. Gen., John R. Henry, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and McRAE and SMITH, JJ.
DAN M. LEE, Presiding Justice, for the Court:

STATEMENT OF THE CASE
After a change of venue from Harrison to Hinds County, Darrell Joe Wagner was convicted of capital murder and sentenced to life in prison in connection with the death of his 18 year old half-sister, Wanda Faye Wagner. Evidence introduced at trial showed that the victim was beaten, raped, strangled, and crushed beneath a pickup truck.
Wagner properly appealed his conviction, asserting the following assignments of error:

*62 I. The lower court erred in not dismissing the charges as Wagner's Sixth Amendment right to a speedy trial was denied.
II. The lower court erred in not dismissing the charges as Wagner's statutory right to a trial within 270 days of arraignment was denied.
III. The lower court erred in not recusing Joseph Meadows and the District Attorney's staff from this case.
IV. The lower court erred in not suppressing the Appellant's statement of December 28, 1987, because the statement was the product of a warrantless arrest without probable cause.
V. The lower court erred in not suppressing the Appellant's statement of December 28, 1987, because the Appellant had requested an attorney and none had been made available to him and the police, after a short break, continued to question the Appellant.
VI. The lower court erred in not suppressing the Appellants's statement of December 28, 1987, because it was involuntary and the product of intimidation and coercion.

STATEMENT OF THE FACTS
On December 26, 1987, the body of Wanda Faye Wagner was found alongside a small logging road leading down to the Big Biloxi River in Harrison County. The body was discovered by a couple on their way to the river to fish. The authorities were summoned and evidence was gathered at that location. The victim was later taken to a funeral home where an autopsy was performed.
Immediately prior to her death, Wanda was living with her mother and stepfather in a mobile home in a small community called Lizana, close to Saucier, Mississippi. For approximately three weeks before the murder, the Defendant Darrell Joe Wagner also resided in the trailer. Before that time Darrell Joe Wagner lived in Buena Vista, Georgia, for a period of about four years.
On December 25, 1987, the family, comprised of Darrell, Wanda, their mother Gloria Daniels, and Gloria's then husband Lonnie Bond, traveled to the Wiggins area in Stone County for a holiday visit to the home of Bond's relatives. After lunch, Darrell and Wanda returned to the mobile home in Lizana in Bond's white 1982 Isuzu pickup truck. Gloria and Lonnie Bond remained at the home of Lonnie's grandparents in the Wiggins area.
Early on the evening of December 25, Darrell (still using Bond's white 1982 Isuzu) dropped his sister off at a party attended by seven or eight of Wanda's acquaintances and friends. Several of the party-goers testified that Wanda left around 10:00 or 10:15 in the company of Leo Craven. Craven testified that he gave both Wanda and a young man a ride to their respective homes. Craven also stated that he dropped off the other passenger first and that he declined an invitation from Wanda to come in at the apparently empty trailer. Craven and Wanda had dated in the past, but he denied having sex with her that night. Jimmy McKay, a local deputy sheriff, testified that he saw Wanda, alone, and talking on a pay telephone at the country grocery store very close to her home at approximately 10:55 p.m. that night. McKay was apparently the last person to see Wanda alive other than Darrell Wagner.
After leaving Wanda at the party, Darrell visited one of his mother's former husbands with whom he was on good terms. Next he went to a bar, then left, and visited a married sister at her residence. Wagner then returned to the bar known as the Ed Owens Club. Darrell testified that he drank beer heavily throughout the night, beginning with cans but culminating with four or five pitchers at the club. According to Darrell, he returned home around 3:00 a.m.
The following account of the events after Darrell's return comes from his testimony and a recorded statement he gave investigators after his ultimate arrest. According to Darrell, Wanda was in her room when he returned from the club. As he sat on the couch he was using for a bed, Wanda came to him and asked him to drive her somewhere, but Darrell could not remember where. He never remembered the destination but he testified that he changed his mind about *63 taking her there as they were traveling Old Highway 49. He pulled off the road. An argument ensued over whether to continue, he claimed Wanda slapped him and he hit her back ("a pretty good lick" at the top of her nose). This was Wagner's explanation for the droplets of blood later found in the cab. Next, according to Wagner, they both got out of the truck, apologized, calmed down and reconciled. Then Wanda asked Darrell if they could continue their ride. According to Darrell, during the ride Wanda asked him to have sex with her. Darrell further testified that he had engaged in sexual activity with Wanda "numerous of times before."
After the assertedly consensual sex acts in the cab of the truck, Wanda allegedly left the truck, naked, "not really running, but she was in a fast walk going south on old 49." According to Darrell, she blurted that she was going to walk to Uncle Oscar's, referring to the home of a nearby relative, to wake them up and tell them what had happened. At his trial Darrell testified that as he drove towards her to try to talk to her, the beer, the wet road, locking brakes, and the bad tires on the truck all combined to cause him to accidentally veer towards Wanda at about the time she slipped and fell. In contrast, in his earlier statement to the authorities he said, "[S]he was gonna walk up there to Uncle Oscar's house and wake them up and I ran her down with the pick-up truck."
At trial Darrell told the following story of the events after the "accidental" killing of his sister:
And when I  when I got her out from beneath the truck, I was  I was horrified of what I had  what I had done by accident.
And I looked at her and I noticed that she was not breathing. And I picked her up, put her on the back of the truck and drove down to where the officers found the body.
* * * * * *
When I got there, I wasn't wasn't [sic] for sure what to do. I  I've never been through or done anything like that. I was scared, frightened, and I sat there for a while in the truck. Then I got out of the truck, took Wanda's body off the back and placed her body off to the right of the back of the truck, and I pulled her body where they found it.
Next, Darrell threw out his sister's purse and clothing and returned home where he went to sleep. The next day, December 26, 1987, he returned to Wiggins where his mother was staying. Darrell inquired as to whether anyone had heard from Wanda, stating that she had not returned home the night before. Lonnie Bond, his stepfather, had planned for the two of them to cut a load of firewood to sell so that Darrell could earn some money. After an unsuccessful attempt to sell the wood, the two returned to the Wiggins house. Gloria Daniels was waiting with news that an unidentified female body had been found near the Big Biloxi bridge. Together the three went to view the body in Gloria's car, leaving the truck in Stone County.
On December 27, 1987, Darrell spent the day working on his car, which was not running. He stopped once to answer some questions by investigators who came to the trailer to look for signs of a struggle. At this time a search was also being performed on the Isuzu with the consent of Lonnie Bond.
On December 28, in the evening, investigators confronted Darrell at a wake for his sister. He accompanied the officers back to the police station. Although he went willingly, the officers testified that they were prepared to arrest him if he refused.
Once at the station, Darrell was questioned, arrested, and given Miranda warnings which he waived by signed, written waiver. At 11:30 p.m., after signing a second waiver and having his rights explained to him again, Darrell gave a recorded statement relating to the events in question.
At trial Darrell defended by attempting to convince the jury that his sister consented and even initiated the sexual contact between the two, and that all her injuries, other than the punch to the nose described above, occurred when he accidentally ran over her. His efforts were greatly hindered by the inconsistencies with the earlier recorded statement as well as by physical evidence *64 suggesting that Wanda was brutally raped and beaten. The jury was not persuaded by Darrell's account and returned a verdict of guilty of capital murder.
Darrell raises no challenge to the weight or sufficiency of the evidence against him, choosing to focus instead on the various legal challenges listed above. For this reason, this statement of facts does not recount the considerable physical evidence introduced by the prosecution. Suffice it to say that there was ample evidence from which the jury could conclude that Wanda Faye Wagner was first beaten with a heavy set of channel lock pliers, then forcefully penetrated both vaginally and anally while being strangled, and finally, while probably still alive, crushed with the Isuzu pickup truck. There was also physical evidence in the form of scratches on Darrell's torso and abrasions on his penis. He attributed the former to his wood cutting trip and the latter he implied were the result of masturbation.

I. The lower court erred in not dismissing the charges as Wagner's Sixth Amendment right to a speedy trial was denied.
Darrell Joe Wagner was arrested on December 28, 1987, and his trial began on September 25, 1989. Thus, for speedy trial purposes the delay was 636 days. This is in excess of eight months and sufficient to trigger consideration of the remaining Barker factors. See Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); Smith v. State, 550 So.2d 406 (Miss. 1989).
Careful balancing of the remaining factors yields the conclusion that Wagner's right to speedy trial was not violated. The bulk of the delay was caused by Wagner's frequent changes of counsel and his reneging on a plea agreement. The multitude of pretrial motions filed on his behalf further contributed to the delay. See Polk v. State, 612 So.2d 381, 386 (Miss. 1992). Wagner made no assertion of his right other than a motion to dismiss charges after the fact. See Adams v. State, 583 So.2d 165 (Miss. 1991). He could not show tangible prejudice, instead relying on the anxiety caused by incarceration and pending charges. On balance, the Barker factors do not indicate that a violation of Wagner's right to speedy trial occurred. Only the prejudice factor weighs in his favor and it is by no means compelling. This assignment of error is without merit.

II. The lower court erred in not dismissing the charges as Wagner's statutory right to a trial within 270 days of arraignment was denied.
Wagner's claim under Mississippi Code Annotated § 99-17-1, the 270 day statute, is likewise without merit. In order to arrive at the claimed 300 days between arraignment and trial, Wagner must count a 56 day continuance requested by his attorneys to prepare for trial. Clearly he cannot be allowed to count the time attributable to his own counsel's request for continuance. See Adams v. State, 583 So.2d 165, 167 (Miss. 1991). This assignment is without merit.

III. The lower court erred in not recusing Joseph Meadows and the District Attorney's staff from this case.
After careful review of the briefs and the record in this matter, it is the opinion of the Court that this is the only error assigned by Wagner that merits detailed discussion. For a short period of time, Wagner was represented by William Martin, as court appointed counsel. After the termination of the relationship, Martin became a member of the staff at the Harrison County District Attorney's Office. There was no evidence in the record to suggest that Martin played any role in the prosecution of Darrell Joe Wagner. Wagner filed a pre-trial motion to have a special prosecutor appointed. The trial judge found that the Harrison County prosecutors who participated in Wagner's trial had no confidential information as a result of the earlier contact between Martin and the defendant and ordered that Martin be isolated from the prosecution.
The following rule is the proper starting point for resolving this issue:
[N]o purpose would be served by applying the proscriptive rule to bar a prosecuting attorney's participation in a criminal case where the evidence fails to establish *65 that the attorney, by reason of his professional relations with the accused, gained any confidential information regarding the matter involved in the criminal prosecution.
Each case must therefore be examined on its facts in order to determine the nature of the attorney's prior relationship with the accused and the substance of any communications between the attorney and the accused.
Gray v. State, 469 So.2d 1252, 1255 (Miss. 1985).
Assuming that the evidence shows that confidential information has passed from the client to the attorney, the attorney then cannot act as prosecutor. Id. Whether the entire district attorney's office is also disqualified is governed by Aldridge v. State, 583 So.2d 203 (Miss. 1991). In Aldridge, this Court stated:
[I]f the State can meet the heavy burden of showing that the accused's confidentiality remained unscathed, then we will not require the district attorney to disqualify himself or his office. This burden, however, is great and is not to be treated lightly by trial courts. The State must show that the assistant district attorney had absolutely no participation in the case, from the time of withdrawal through adjudication; divulged no confidential information; and notified the other party promptly upon becoming aware of the conflict of interest.
Aldridge v. State, 583 So.2d 203, 205 (Miss. 1991).
In Aldridge, the assistant district attorney represented the defendant for eleven months and later participated in his trial. In the instant case, however, the assistant district attorney spoke with the defendant only twice and was totally screened from the prosecution team. The trial court made the following factual finding in this case which satisfies the first two requirements from Aldridge:
The Court finds that the District Attorney's Office has instituted the appropriate proper steps to ensure that no information coming to William Martin, who at one time represented the Defendant, has been transmitted by him to anyone on the District Attorney's staff.
There was ample evidence in the record to support this finding. Both Martin and Joseph Meadows, the D.A., testified that upon joining the staff, Martin was assigned to the Second Judicial District of Harrison County. His contract defense work was done in the First Judicial District. This assignment put Martin in a separate branch office from the team that prosecuted Wagner. Furthermore, Martin testified under oath outside the presence of the prosecutors, that he could not remember anything substantial from his single interview of Wagner. Their first conversation consisted of Martin asking Wagner if he had been notified that Martin would be acting as his court appointed counsel; Wagner had not, so Martin indicated that he would return later. His files were reviewed by the judge and they corroborated his statements that he obtained no confidential information.
As for notice to the defendant, the lower court's failure to make an express finding was excusable in that the ruling in this case preceded the Aldridge decision. The fact that Wagner was able to bring a motion to recuse pretrial is sufficient to establish timely notice.
The Appellant's evidence on this point consists entirely of the following testimony offered at the pre-trial hearing by Darrell Joe Wagner:
A. [Martin]  came over there the first time, and he said that Jimmy McGuire had sent in a motion to withdraw from my case, and he asked me had I received anything in the mail concerning and telling me that him, William Martin, and Earl Stegall was going to be my new court-appointed lawyers.
THE COURT: Who?
A. William Martin and Earl Stegall. I told him no, that I hadn't, and he said since I hadn't received anything that he could not talk to me then about my case.
Q. Was this in the Summer of 1988? Is that about when this took place?
A. Yes.
Q. Then proceed. Did you meet with him again?

*66 A. It was about a week, week and a half later, Earl Stegall and William Martin, himself, came back over and we had a visit, and I discussed with him about my case.
Q. During this meeting did you make any comments to Mr. Martin that you would not want repeated elsewhere?
A. Yes. I feel like everything that I say to my lawyers should be kept confidential, between me and them.

Q. And you feel like this second visit with Mr. Martin, you do recall making those type of comments?
A. Yes, I do.
Q. Did you meet with Mr. Martin again?
A. No, sir. I think we came over here and heard a few motions or something like that, because they set my trial date for the 3rd of December, 1988.
Q. Did Mr. Martin represent you in court?
A. He was here.
Assuming for the sake of argument that this testimony is sufficient to establish that confidential information passed from Wagner to Martin, the evidence of screening procedures presented by the prosecution was more than sufficient to support the lower court's finding that no confidential information was passed along to other members of the district attorney's staff. Therefore, this assignment of error is without merit.

IV. The lower court erred in not suppressing the Appellant's statement of December 28, 1987, because the statement was the product of a warrantless arrest without probable cause.
Wagner was taken into custody shortly after 7:00 p.m. on December 28, 1987, at a funeral parlor while attending a wake for the victim. The officers testified that he voluntarily accompanied them back to the station but that they were prepared to arrest him if he refused. Wagner testified that he was handcuffed and taken to the station. After questioning Wagner, the investigators formally placed him under arrest around 8:30 p.m.
Under this assignment, Wagner first argues that he was arrested illegally. He then proceeds to the factors governing the admissibility of a confession following an illegal arrest.
In order to have legally arrested Darrell Joe Wagner for capital murder without a warrant, the police officers must have had reasonable cause to believe that Wagner committed a felony. Henry v. State, 486 So.2d 1209, 1212 (Miss. 1986).
According to Wagner's brief, "No probable cause existed to take Appellant to the police station on December 28, 1987 for further questioning, which the cops warrantlessly did." The State, on the other hand, relies on the following testimony of one of the arresting officers:
As far as specific items that were found on the truck, I can tell you that there was blood both in the cab, there was hair that we found on the undercarriage, there was a Coca Cola t-shirt in the back of the truck that had dark stains on it. [similar to what the officers knew the victim to be wearing the night of her murder].
The fact that Darrell Joe Wagner did have possession of the truck the night that Wanda Wagner came up missing, and the fact that we found the truck with that [evidence] is the reason we wanted to question him further, and that we had discussed the case, Major Cook and myself, and the fact that those items were found on the truck, we were prepared to arrest Darrell Joe Wagner.
Additionally, at the time Wagner was picked up, no one had been able to corroborate his presence at the Owens club on the night of the murder.
Probable cause means more than a bare suspicion but less than evidence that would justify condemnation. Henry v. State, 486 So.2d 1209, 1212 (Miss. 1986). Even assuming that the earliest police action at the funeral home was an arrest, the authorities were operating on more than a bare suspicion that Wagner was involved. Therefore, this assignment of error is without merit.
*67 Assuming, for the sake of considering Wagner's position completely, that the arrest was improper for lack of reasonable cause, it does not follow that the statement was inadmissible. Rather, the confession must then be examined in light of the factors applied by this Court in Bolton v. State, 530 So.2d 1360 (Miss. 1988). These factors are:

1. The giving of Miranda warnings and the circumstances.
There is little doubt that Wagner was advised of his rights prior to making his statement. The record contains testimony that the warnings were given as well as two printed waiver forms signed by Wagner.

2. The temporal proximity of the arrest and the confession.
The defendant was taken into custody around 7:00 p.m. and formally placed under arrest at 8:30 p.m. The incriminating statement was given at 11:30 p.m. Despite Wagner's conclusory assertion through counsel that "A clear connection between the events are obvious," the three hour period after arrest is not inconsistent with a voluntary confession.

3. The presence of intervening circumstances.
Here Wagner points to circumstances between the arrest and the confession including the making of photographs of scratches on his body as well as abrasions on his penis, and his unsubstantiated assertion that he was told that manslaughter was different from capital murder. In his estimation, these circumstances contributed to breaking down his free will and coercing a confession.
While it is true that the statements about manslaughter, if actually made, would tend to reflect adversely on the voluntariness of the confession, it is also true that Wagner prefaced his recorded statement by expressly acknowledging that "no promises or threats have been made to you and no pressure, coercion or force of any kind has been used against you." This item alone does not provide a sufficient basis for overturning the trial judge's finding of voluntariness.

4. The purpose and flagrancy of the official misconduct, i.e. the making of the improper arrest.
Here Wagner makes no argument but merely asserts that "you cannot get much more flagrant that [sic] going to the victim's wake and arresting someone." Although, we assume improper arrest for the purposes of this assignment, we cannot ignore the evidence implicating Wagner in the murder of his half-sister. At the very least, this evidence was sufficient to remove any possibility of "flagrant" misconduct.

5. Any other circumstances that seem relevant.
Under this factor, Wagner asserts that the police should have placed him in jail and questioned him the next day rather than taking pictures and continuing to question him. Another relevant circumstance not argued by either side was that the law enforcement officers knew that a brutally violent murder had occurred. The sooner they could learn the identity of the killer, within the framework of proper interrogation, the sooner they could eliminate the possibility of a continuing threat to public safety. On balance, this factor does not tend to establish that the confession was involuntary.
The arrest of Darrell Joe Wagner was properly based on reasonable cause. Even assuming an improper arrest, the confession was admissible under Bolton.

V. The lower court erred in not suppressing the Appellant's statement of December 28, 1987, because the Appellant had requested an attorney and none had been made available to him and the police, after a short break, continued to question the Appellant.
Under this assignment of error, Wagner argues that his confession was obtained after he had requested a lawyer. The trial judge found that no lawyer was requested on the basis of the testimony of Ricky Jacobs (one of the interrogators), the two signed waivers of the right to counsel executed by Wagner, and Wagner's taped acknowledgment *68 that he understood his right to stop the interview at any time.
The sum of Wagner's attempt to relate the legal rules on requests for attorneys to his statement is as follows:
The Appellant testified he asked for an attorney and he also placed an X on the waiver form and his initials appear by the request for an attorney on this waiver of right form. The Appellant contends he requested an attorney and one should have been furnished and was not.
Officer Jacobs testified that he customarily asks suspects to initial the form after he reads their several rights to them in order to establish that said suspects have actually been apprised of their rights prior to waiving them. The transcript and the testimony of the officers establish that Darrell Joe Wagner gave his statement after an intelligent waiver of his rights, notwithstanding his later assertion that he requested a lawyer and his clever attempt to explain the signed waivers. This assignment of error is without merit.

VI. The lower court erred in not suppressing the Appellants's statement of December 28, 1987, because it was involuntary and the product of intimidation and coercion.
Here Wagner asserts that his statement was not voluntary and should have been excluded. He reiterates his basic claim that the following factors coerced his confession:
1. he was taken into custody at his sister's wake,
2. he repeatedly asked for an attorney and signed the waivers of his rights in hopes of obtaining one,
3. he was forced to undress and submit to photographs in front of numerous deputies, and
4. the mention of the difference between manslaughter and murder pressured him into making a manslaughter confession.
The rules regarding admissibility of confessions or other inculpatory statements are familiar. The Miranda warnings must be given, and the accused must then give a knowing and voluntary waiver of both his right to remain silent and his right of access to counsel. Kirkland v. State, 559 So.2d 1046 (Miss. 1990). The prosecution bears the burden of proving beyond a reasonable doubt each fact which is a prerequisite for admissibility. Id. The trial judge conducted a full hearing on the defense motion to suppress and found that the State had satisfied its burden. The only thing in the record to contradict his finding is the testimony of Wagner. These bare allegations of coercion are not sufficient to raise a reasonable doubt where the record amply supports the ruling of the trial judge. Therefore, this assignment of error is without merit.

CONCLUSION
Darrell Joe Wagner's legal claims related to speedy trial are defeated by his own actions which caused much of the delay. His disqualification claim is defeated by the judge's finding and the overwhelming evidence that no confidential information was used against him. Finally, his allegations of coercion are not corroborated by any evidence whatsoever. Accordingly, his conviction is affirmed.
CONVICTION FOR CAPITAL MURDER AND LIFE SENTENCE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS and SMITH, JJ., concur.