[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 554 
¶ 1. Gary Davis appeals his conviction of armed robbery and assault with a deadly weapon in the Jones County Circuit Court. Davis was sentenced to twenty years on each charge to run consecutively. Davis now appeals his convictions, raising the following issues as error:
I. WHETHER DAVIS'S RIGHT TO A SPEEDY TRIAL WAS VIOLATED.
II. WHETHER THE TRIAL COURT ERRED IN DISMISSING HIS MOTION TO DISMISS FOR SPEEDY TRIAL VIOLATIONS WHEN THE STATE FAILED TO MAKE AN AFFIRMATIVE RESPONSE.
III. WHETHER DAVIS WAS REQUIRED TO PROCEED WITHOUT SUFFICIENT NOTICE AND *Page 555 AN OPPORTUNITY TO HAVE WITNESSES SUBPOENAED AND PRESENT.
IV. WHETHER THE TRIAL COURT IMPOSED A SENTENCE AMOUNTING TO CRUEL AND UNUSUAL PUNISHMENT.
V. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
VI. WHETHER THE TRIAL COURT ERRED IN DENYING DAVIS'S MOTION TO MERGE THE COUNTS OF THE INDICTMENT.
¶ 2. Finding no error, we affirm.
 FACTS
¶ 3. Frank Smith, a painter, drove to the South Park Village area of Laurel on July 10, 1994. Having recently painted buildings there, he was familiar with the area. As he drove by Units 30 and 33, he heard someone yell, and he slowed down. Two black males approached, and one of the men tried to grab Smith's keys. Smith held onto the keys and got out of the car, and the second man pointed a gun at Smith and demanded Smith's wallet, which contained $125, and his watch. After the first man hit him on the head with a claw hammer, Smith jumped back into his car. As he started his car and attempted to leave, the second man shot him through his left thigh. Bleeding from his head and his leg, Smith drove a short distance, pulled over, and requested help from a bystander. An ambulance took Smith to the hospital. He later identified Davis from a photo array as the individual who stole his wallet and shot him.
 PROCEDURAL HISTORY
¶ 4. On July 10, 1994, the Jones County grand jury indicted Davis, along with a co-defendant, on charges of armed robbery and aggravated assault. The indictment was filed on September 14, 1994, and the circuit clerk issued a capias which listed the charges against Davis. The return indicates that a deputy sheriff executed the capias on March 17, 1996. The circuit judge rendered bench warrants on May 14, 1996, and August 12, 1996. Also on August 12, 1996, the judge rendered an "Order Placing Hold on Defendant, Gary Davis," directing the sheriff of Lauderdale County to notify the sheriff of Jones County as soon as the court in Lauderdale County disposed of pending charges so that the defendant could be returned for disposition of the charges in Jones County.
¶ 5. The circuit judge completed another bench warrant on January 13, 1997. The bench warrant return reflects that Davis was placed in the Jones County Jail on February 12, 1997. At his arraignment on February 25, 1997, Davis waived the reading of the indictment and pleaded not guilty to both charges. The court appointed the public defender to represent Davis and set the case for trial on March 26, 1997. On March 14, the public defender filed a motion for additional time for the purpose of filing motions and entering plea petitions. He submitted that he "had difficulty in obtaining an initial interview with the [d]efendant." During the pretrial status hearing on March 24, 1997, defense counsel asserted that Davis had not contacted him. He was then informed of Davis's incarceration. On the anticipated date for trial, defense counsel expressed hope that a plea agreement would be finalized and, alternatively, requested that he be allowed to "plead time" because Davis had been locked up for over a year.
¶ 6. After Davis refused the plea bargain offered by the district attorney, defense counsel detailed for the record that he was unaware that he had been appointed to represent Davis until March 11, and he did not request the file until March 24, 1997. For these reasons, he only learned of potential defense witnesses on March 27. He moved for dismissal of the case based on the fact that the indictment was dated two and a half years earlier. The court denied the motion and continued the case *Page 556 
until April 14, 1997. During a pretrial status hearing on April 3, Davis's attorney stated, "That's for trial, your Honor." He did not indicate any necessity for additional time.
¶ 7. Immediately prior to trial, Davis moved for the court to require the State to strike one count of the indictment and to choose whether to proceed against him for either armed robbery or aggravated assault. He asserted that he should not be required to stand trial on more than one crime based upon only one set of facts. The court heard the basis for the indictment and denied the motion to strike.
 TRIAL
¶ 8. At a side-bar conference, the defense noted that it had not announced ready and was not in a position to proceed without Sahenia Trotter, a defense witness who was subpoenaed but could not be served because she had moved to another state. The court instructed the defense to have the sheriff find any absent witnesses. Frank Smith testified first for the State. Smith stated that he was a self-employed painter and that he painted the South Park Village apartment buildings' exteriors several months prior to the incident on Sunday, July 10, 1994. On that day, Smith drove to Laurel in the early afternoon to find Mike, the maintenance man at South Park Village, because he needed a tall ladder in order to finish painting his brother's house. He had been unable to rent a bucket lift in Hattiesburg because they were being used for the construction of a new mall.
¶ 9. Smith explained that he drove around the South Park Village complex looking for Mike or Mike's truck. At the back of the complex, Smith made a U-turn to avoid an area where water covered the road. As he drove away from the water, Smith heard someone call him. Thinking that it might be Mike, Smith pulled over. He saw a black male coming toward his car, and a second black male reached into the driver's side window for the keys. Smith grabbed the keys and the man's hand, and then he noticed a pistol pointed at him.
¶ 10. Smith identified the man with the pistol as the defendant, Gary Davis. Davis told him to get out of the car and drop his wallet. According to Smith, Davis said, "you won't be needing it [the wallet] where you will be going." Sensing that Davis was about to shoot him, Smith jerked the keys away from the other man who grabbed a hammer from Smith's car and demanded the keys. Smith said that he took his driver's license and threw the wallet as he jumped toward his car. The man with the hammer struck Smith on the head, knocking him into his car. While his leg dangled from the car, Smith turned the ignition, and Davis shot Smith in his left leg. Smith drove away as fast as he could. He stopped by a park where he saw a man, and he told the man he had been shot. An ambulance arrived, and a Laurel policeman located the bullet at the scene.
¶ 11. Smith identified photographs of the apartment complex and indicated the location of the incident. He stated that he did not know Gary Davis by name at the time of the incident and that he identified Gary Davis after seeing his picture in the photo array that Officer Knight provided. He identified a photograph of the bullet wound to his leg. On cross-examination, Smith recalled his statement to police. He described the extension ladder and the maintenance man, and he sketched a map of the South Park Village area indicating the location of the office and maintenance building. He explained that his window was open because his 1976 Monte Carlo two-door had no air conditioning. The defense raised questions about Smith's attempt to get a ladder owned by the Housing Authority, and Smith explained that he could haul a ladder on his car roof and detailed his search for a ladder in Hattiesburg.
¶ 12. Officer Kevin Jackson, a patrolman with the Laurel Police Department, explained that a confidential informant told *Page 557 
him that Gary Davis was a possible suspect in the case. The informant received nothing in exchange for the information and had previously provided credible information. Officer Jackson described the South Park Village area which had previously been called Johnson Circle, and he acknowledged the high incidence rate for narcotics sales in that area. He described the maintenance building, and he located, on Frank Smith's diagram, the Brown Circle office and the drainage ditch running between the Brown Circle and Johnson Circle projects.
¶ 13. Next, Officer Lee (Mackie) Knight, a former detective with the Laurel Police Department, testified. He responded to the call on July 10, 1994, interviewed the victim at the hospital emergency room, and proceeded to the Johnson Circle area where the shooting occurred. After obtaining information from Officer Jackson, Officer Knight prepared a photo line-up and presented it to Frank Smith at the hospital. From the first photo array, Smith identified Davis's co-indictee. Smith provided a statement to police on the evening of July 10 at the police station. After he located a photograph of Gary Davis, Officer Knight prepared a photo-line-up and took it to Smith's house on July 12. He explained the photo array and said that Smith identified Davis without hesitation. Officer Knight established venue and described Smith's injuries. On cross-examination, he acknowledged that Smith could not describe the maintenance man to officers. Thereafter, the State rested.
¶ 14. After the defendant moved for a directed verdict and the court denied the motion, Davis's counsel mentioned that one witness had not been found. The State objected to a defense witness who would testify as Davis's alibi, cited Rule 9.05 URCCC, and asserted that the defense should have provided notice of the alibi defense at least ten days before the witness testified. Davis's counsel stated that he did not know about the witness ten days earlier, that he never talked to any of the witnesses until the trial started, and that the witnesses would testify that Davis was in the area.
¶ 15. The defense called Terry White, a resident of South Park Village. He testified that Davis was with him in White's mother's apartment when the incident occurred, but he could not recall the precise time that Davis arrived or departed. He alleged someone told him that "the white man" was "down there buying dope." White submitted that he was a resident at the Jones County Jail at the time of this trial, but he said that neither he nor Davis sold drugs on the day of the shooting. He said that he, Davis, Fred Gammage, "Ceddy-Poo," and a boy named Ervin were at his home. He did not hear the gunshot, but he learned about it the next day when law enforcement officers were in the area asking questions about the shooting. White testified that he had not talked to Davis since his (White's) incarceration. After the defense asked him who Davis's girlfriend was at the time of the shooting, White recalled that Patricia Collins was at White's home at the time of the shooting.
¶ 16. In a side-bar conference, the State informed the court that the next witness, Cedric Benton, failed to appear for his interview. The court entered into the record that he should have been informed of the inability to talk to witnesses prior to trial. At the defense's request, the court authorized a subpoena instanter for the maintenance man.
¶ 17. The defense proceeded by calling Cedric Benton. Benton testified that he was at White's house with White, Davis, and Patricia Collins. They heard the gunshot from the hallway and went outside. Benton left five or ten minutes after the shooting and could not remember whether Gammage was with them on that day. Benton admitted that he and Patricia Collins discussed the incident earlier in the day at the courthouse. *Page 558 
¶ 18. Patricia Collins testified that she and Davis dated for three years and had a baby together. At the time of the trial they had not been seeing each other for over a year. Collins said that she and Davis were at White's home in South Park Village at the time of the shooting, but she could not recall what time Davis arrived or departed. She recalled that she saw a police officer point Davis's picture out to Smith in the jury room earlier in the week of trial. She described the officer and alleged that Smith could not picture Davis's face. She elaborated, "So [the officer] just said, forget it. We got it. Don't worry about it." She had not seen the officer again.
¶ 19. Collins acknowledged that she and Cedric Benton discussed the case and she remarked, "[Benton] said he don't see why he put him up in here." Collins said that she no longer talks with Davis, and Davis and his family do not see the baby. She never told a law officer about Davis's alibi because nobody asked her. She did not hear the shot or see the incident, but she heard about it later. Collins denied that she ever told Don Scott, the district attorney's investigator, that Davis was with her at her mother's apartment, 75 Brown Circle. She said that Davis was with her all of the time, but she could not remember each day specifically, and she conceded that she would not have remembered the facts in her testimony if someone had not spoken to her about the subject incident.
¶ 20. White, Benton, and Collins each testified that they never told law enforcement officials that Davis was with them because they did not know that Davis was indicted in this crime. Also, these witnesses provided conflicting information about who was present with Davis on that day.
¶ 21. During a conference at the bench, the judge explained to the defense counsel that he should have already checked the sufficiency of the indictment. The defense proceeded to inform the jury that the parties stipulated that the capias was not served on Davis until March 17, 1996. Both parties withdrew to question Mike Morrow, the maintenance man, who had just arrived at the courthouse.
¶ 22. Morrow, the maintenance supervisor at South Park Village, testified that he was familiar with the subject case and had never discussed it with anyone. He only learned that he would testify on the day of his appearance. Morrow said that he met Frank Smith when his company painted some buildings at South Park Village, but he never saw Smith at the complex on a weekend, and he never discussed the possibility of Smith borrowing or purchasing a ladder. He drove a red 1979 Chevrolet pickup truck at the time that Smith was shot. He said that loaning ladders was against the policy and that he might get in trouble if he loaned a ladder to someone. Morrow remains on 24-hour call, and he heard about the incident about a day after it occurred. He averred that Smith completed his work at the complex about a week prior to the shooting.
¶ 23. Davis elected not to testify. The court questioned Davis on the record and established that Davis understood his rights in that regard. In rebuttal the State called Don Scott, an investigator for the Jones County District Attorney's Office. Scott testified that he spoke to Patricia Collins to determine what her testimony would include. According to Scott, she related to him, on both occasions that they spoke, that she and Davis were at her apartment on Brown Circle all day on July 10, 1994, and she never indicated that they were at Terry White's apartment.
 ANALYSIS I. WHETHER DAVIS' RIGHT TO A SPEEDY TRIAL WAS VIOLATED.
¶ 24. According to the docket sheet, a capias return was filed June 1, 1995, but that return is not provided in the record *Page 559 
on appeal. On May 13, 1996, the court was informed that Davis was in jail in Lauderdale County. After the August 12, 1996, status hearing when the court learned that no bond was set for the capital murder charges pending against Davis in Lauderdale County, the judge issued a hold order and noted that he wanted Davis brought to Jones County after proceedings against him were completed in Lauderdale County. The Jones County Circuit Court continued to conduct status hearings until Davis was returned to Jones County.
¶ 25. Davis never requested a speedy trial; instead, he moved to dismiss the case on the day set for trial on the grounds that he was denied his right to a speedy trial. The Mississippi Supreme Court has clarified, "[A] demand for dismissal for violation of the right to speedy trial is not the equivalent of a demand for speedy trial. . . ." Kolberg v. State, 704 So.2d 1307, 1319 (Miss. 1997) (citing Perry v. State, 637 So.2d 871, 875 (Miss. 1994) and Adams v. State, 583 So.2d 165, 169-70 (Miss. 1991));see also Walton v. State, 678 So.2d 645, 650 (Miss. 1996). The Mississippi Supreme Court has warned that a defendant's failure to request a speedy trial might suggest that the defendant was not deprived of this right:
 On the theory that "the more serious the deprivation, the more likely the defendant is to complain" of delays in trial, the Barker court said the failure to assert the right to a speedy trial "will make it difficult for a defendant to prove he was denied a speedy trial." Barker 407 U.S. at 531-32, 92 S.Ct. at 2192-93, 33 L.Ed.2d at 117-18.
Fisher v. State, 532 So.2d 992, 996 (Miss. 1988). However, recognizing that Davis did raise this issue at the trial level, we address this assignment of error.
¶ 26. The Sixth and Fourteenth Amendments to the United States Constitution and Article Three, Section Twenty-six of the Mississippi Constitution of 1890 guarantee a criminal defendant's right to a speedy trial, which attaches when the defendant is effectively accused of the crime, Skaggs v. State,676 So.2d 897, 900 (Miss. 1996). The constitutional right exists separate and apart from the right to a speedy trial provided in Miss. Code Ann. § 99-17-1 (Rev. 1994). Simmons v. State, 678 So.2d 683, 686 (Miss. 1996). That section provides: "Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." Miss. Code Ann. § 99-17-1 (Rev. 1994). The trial court's finding of good cause for delay will be reviewed as any other finding of fact and will remain undisturbed if the record contains substantial credible evidence to support it. Walton v.State, 678 So.2d 645, 648 (Miss. 1996); McNeal v. State,617 So.2d 999, 1007 (Miss. 1993); Folk v. State, 576 So.2d 1243, 1247 (Miss. 1991).
¶ 27. We examine alleged violations of the constitutional right to a speedy trial by applying the balancing test outlined in the U.S. Supreme Court's decision in Barker v. Wingo, 407 U.S. 514 (1972).Simmons v. State, 678 So.2d 683, 686 (Miss. 1996); Skaggs v.State, 676 So.2d 897, 900 (Miss. 1996); Wagner v. State,624 So.2d 60, 64 (Miss. 1993). In Barker, the court listed four factors to be weighed: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) any prejudice to the defendant resulting from the delay. Skaggs, 676 So.2d at 900. No solitary factor is controlling, Id., and the court is not strictly limited to theBarker factors. State v. Magnusen, 646 So.2d 1275, 1278 (Miss. 1994). These factors must be weighed in light of the facts and circumstances of each case, including the conduct of the prosecution and of the accused. Giles v. State, 650 So.2d 846, 850 (Miss. 1995); Beavers v. State, 498 So.2d 788, 790 (Miss. 1986), impliedly overruled on other grounds by State v. Ferguson,576 So.2d 1252, *Page 560 
1255 (Miss. 1991); see McGhee v. State, 657 So.2d 799, 802 (Miss. 1995).
 Statutory Right
¶ 28. Davis asserts on appeal, as he did in his motion for new trial, that the State should have been required to show good cause because the delay in this case extended beyond eight months. Therefore, we must examine the timetable from arraignment to trial. Davis was arraigned in Jones County on February 25, 1997, and trial was set for March 26, 1997. At his arraignment, Davis waived reading of the indictment. He raised no objection and offered no comment regarding the length of time that passed between the filing of the indictment on September 14, 1994, and the arraignment on February 25, 1997. Despite his knowledge of the Jones County charges, Davis never demanded a speedy trial. When the trial date was set, he offered no objection.
¶ 29. Davis never raised the issue of his right to speedy trial until the date the trial was set to commence, March 27, 1997, after plea negotiations failed. He argued for a dismissal of the case, asserting that it might be difficult to locate certain witnesses. The court denied the motion to dismiss and, pursuant to the defense's motion, granted a continuance until April 14, 1997. The trial actually began on April 17, 1997, approximately fifty-three days after Davis's arraignment and well within the two hundred seventy (270) days provided by Miss. Code Ann. § 99-17-1
(Rev. 1994). Therefore, Davis's statutory right to a speedy trial was not violated, and the lower court did not err in denying the motion to dismiss without requiring the State to show good cause for delay.
 Constitutional Right
¶ 30. In Mississippi, a delay of eight months or more between arrest and trial is presumptively prejudicial. Johnson v. State,666 So.2d 784, 792 (Miss. 1995); Thorson v. State,653 So.2d 876, 890 (Miss. 1994); Spencer v. State, 592 So.2d 1382, 1387 (Miss. 1991). Although a presumptively prejudicial delay does not necessarily require reversal, it does require close examination of the remaining Barker factors. Johnson, 666 So.2d at 792; Handleyv. State, 574 So.2d 671, 676 (Miss. 1990). If the length of delay is not presumptively prejudicial, the reviewing court is not obligated to examine the remaining Barker factors. Johnson, 666 So.2d at 792; Spencer, 592 So.2d at 1387.
¶ 31. The first capias was executed on March 17, 1996. At a pretrial status hearing on May 13, 1996, Davis's attorney for the Lauderdale County case informed the court regarding Davis's incarceration. The court regularly reviewed the case by conducting status hearings. The court also entered an "Order Placing Hold on Defendant, Gary Davis," directing the Sheriff of Lauderdale County to notify the Sheriff of Jones County when proceedings were completed on the pending charges so that the defendant could be returned to Jones County. Davis's capital murder trial was set for February 5, 1997. On January 13, 1997, the court continued the Jones County case, stating for the record that Davis was a fugitive. Finally, on February 24, 1997, the court was informed that Davis entered a plea agreement for the Lauderdale County offense. Davis was expeditiously arraigned in Jones County the next day, and trial was set for March 26, 1997.
¶ 32. The possibility that Davis's capital murder trial could result in a death sentence proves significant in this case. While a defendant's incarceration for another crime is not generally considered a sufficient reason to delay a trial, the situation is different where a death sentence is involved. Fisher v. State,532 So.2d 992, 995-96 (Miss. 1988), rev. on other grounds. The Fifth Circuit has opined that a court is justified in electing "not to expend scarce judicial and prosecutorial resources" in trying a defendant who is facing a death sentence in another case because "the execution . . . would have eliminated the need *Page 561 
for any trial at all." Jamerson v. Estelle, 666 F.2d 241, 244 (5th Cir. 1982) (quoting Turner v. Estelle, 515 F.2d 853, 856 (5th Cir. 1975)); see Fisher, 532 So.2d at 995-96. Moreover, the supreme court has ruled that no prejudice exists as a result of incarceration while awaiting trial if the defendant is serving a sentence on unrelated charges. Johnson v. State, 666 So.2d 784, 791 (Miss. 1995) (citing Winder v. State, 640 So.2d 893, 895 (Miss. 1994)).
¶ 33. We allude to Dickerson and analogize the Jones County Circuit Court's "holding order" and the State "detainer" discussed by the Fifth Circuit Court:
 The state detainer was not the basis for Dickerson's federal incarceration. "[A] detainer merely puts the officials of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison." United States v. Mauro, 436 U.S. 340, 358, 98 S.Ct. 1834, 1846, 56 L.Ed.2d 329 (1978). Speedy trial considerations do not arise until a defendant is formally charged with a crime or actually restrained in connection with that crime. See Marion, 404 U.S. at 320-21, 92 S.Ct. at 463-64.
Dickerson v. Guste, 932 F.2d 1142, 1144 (5th Cir. 1991). Similarly, the charges in Jones County "were not the basis for" Davis's Lauderdale County incarceration. The holding order in this case merely provided notice to Lauderdale County officials that Davis was "wanted in another jurisdiction for trial" upon completion of the capital murder proceedings. Those proceedings were not completed, and Davis was not "actually restrained in connection with" the charges in the current case, until he was returned to Jones County in February of 1997. Therefore, the delay did not exceed eight months from the time of restraint in connection with the Jones County charges and is not presumptively prejudicial.
¶ 34. We now address the reason for the protracted interval between the indictment and the arraignments. The court explained this delay during its hearing on the motion for new trial:
 THE COURT: The Court . . . made these findings, that the defendant had been given a speed [sic] trial. I looked at the file in regards to that ruling [on the motion to dismiss], and if you look at the file you will find in the confines of that file that Gary Davis absented himself from the Court. He was not available to this Court to give him a speedy trial under his pleadings.
 MR. SULLIVAN: It is my understanding that he was incarcerated in Lauderdale County.
 THE COURT: I can not [sic] help that. That is his fault, not the Court's fault.
(emphasis added.)
¶ 35. Finding that Davis did receive a speedy trial under the facts and circumstances of this case, we resolve this issue adversely to Davis.
 II.
WHETHER THE TRIAL COURT ERRED IN DISMISSING HIS MOTION TO DISMISS FOR SPEEDY TRIAL VIOLATIONS WHEN THE STATE FAILED TO MAKE AN AFFIRMATIVE RESPONSE.
¶ 36. As we noted in resolving Davis's first issue, his statutory right to speedy trial was not violated because his trial commenced within 270 days of his arraignment. See Miss. Code Ann. § 99-17-1
(Rev. 1994). Therefore, the State was not required to make an affirmative response to Davis's motion to dismiss.
 III.
WHETHER DAVIS WAS REQUIRED TO PROCEED WITHOUT SUFFICIENT NOTICE AND AN OPPORTUNITY TO HAVE WITNESSES SUBPOENAED AND PRESENT.
¶ 37. Davis failed to cite any relevant authority for this assignment of error. *Page 562 
On appeal, failure to cite authority engenders a procedural bar, and this court will not review the unsupported issues. Williams v. State,708 So.2d 1358 (¶ 12) (Miss. 1998); Grey v. Grey,638 So.2d 488, 491 (Miss. 1994); McClain v. State,625 So.2d 774, 781 (Miss. 1993); Smith v. Dorsey,599 So.2d 529, 532 (Miss. 1992).
¶ 38. The record does not indicate a specific request for a continuance, but the defense instructed the court that it did not feel ready to proceed in the absence of one of its witness. Still, Davis's failure to mention the supposed denial of a continuance in his motion for new trial constitutes another procedural hindrance to our review. In Pool v. State, 483 So.2d 331, 336 (Miss. 1986), the Mississippi Supreme Court held that the denial of a continuance must be preserved for appeal by including that issue in a motion for new trial. Recognizing that Davis's failure to follow the established procedure prohibits our review of this assignment of error, we decline to address its substance.
 IV.
WHETHER THE TRIAL COURT IMPOSED A SENTENCE AMOUNTING TO CRUEL AND UNUSUAL PUNISHMENT.
¶ 39. Again, Davis failed to cite relevant authority for this assertion of error, and we may refrain from reviewing issues unsupported by authority. See Williams v. State, 708 So.2d 1358
(¶ 12) (Miss. 1998); Grey v. Grey, 638 So.2d 488, 491 (Miss. 1994); McClain v. State, 625 So.2d 774, 781 (Miss. 1993); Smithv. Dorsey, 599 So.2d 529, 532 (Miss. 1992).
¶ 40. Failure to preserve this issue for appeal constitutes another impediment to our review. Davis's counsel mentioned, prior to sentencing, that following the State's sentencing recommendation would result in eighty years' incarceration, constituting cruel and unusual punishment. However, Davis failed to timely object after the sentence was pronounced and did not raise this issue in his motion for new trial.[1] The trial court will not be held in error on an issue never presented for its consideration. Chase v.State, 645 So.2d 829, 846 (Miss. 1994). Therefore, "[i]f an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial." Collins v. State,594 So.2d 29, 36 (Miss. 1992) (citations omitted). Ascertaining that this assignment of error is procedurally barred, we refrain from addressing it further.
 V.
WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 41. Where an appellant contends that the jury's verdict is against the overwhelming weight of the evidence, that contention must be included in a motion for new trial. Smith v. State,716 So.2d 1076 (¶ 13) (Miss. 1998); McLemore v. State,669 So.2d 19, 24 (Miss. 1996); Jackson v. State, 423 So.2d 129, 132 (Miss. 1982); Gilmer v. State, 46 So.2d 447, 448 (Miss. 1950).
¶ 42. Davis did not raise this issue in his motion for new trial. Instead, he asserted that the trial court "erred in failing to sustain the [d]efendant's motion *Page 563 
for a directed verdict." Motions for directed verdict or for judgment notwithstanding the verdict impugn the sufficiency of the evidence, while motions for new trial attack the weight of the evidence. McClain v.State, 625 So.2d 774, 778 (Miss. 1993). Therefore, even in challenging the denial of a directed verdict Davis failed to include any assertion regarding the weight of the evidence in his motion for new trial. Therefore, due to the procedural bar, we refrain from further analysis of this question.
 VI. WHETHER THE TRIAL COURT ERRED IN DENYING DAVIS' MOTION TO MERGE THE COUNTS OF THE INDICTMENT.
¶ 43. Davis argues that the trial court should have "merged" the armed robbery count and the aggravated assault count because they arise from the same set of facts. Although he cites no relevant, controlling authority for this assignment of error, we observe that the two separate offenses do not embrace the same elements, and one is not a lesser-included-offense of the other.
¶ 44. "A criminal defendant may be prosecuted for more than one statutory offense arising out of a basic set of facts." Harden v.State, 460 So.2d 1194, 1199 (Miss. 1984) (citing Blockburger vs.U.S., 284 U.S. 299 (1931).
¶ 45. The Mississippi Supreme Court adopted the Blockburger holding in Smith v. State:
 Each of the offenses created requires proof of a different element. The applicable rule is that where the same act or transaction constitutes a violation of two distinct statute provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. Gavieres v. United States, 220 U.S. 338, 342, 55 L.Ed. 489, 490, 31 S.Ct. 421, and authorities cited. In that case this Court quoted from and adopted the language of the Supreme Court of Massachusetts in Morey v. Com., 108 Mass. 433: "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." 284 U.S. at 304, 52 S.Ct. at 182, 76 L.Ed. at 309.
Smith v. State, 429 So.2d 252, 253 (Miss. 1983); see also Keyesv. State, 708 So.2d 540, 544 (Miss. 1998); Brock v. State,530 So.2d 146, 149 (Miss. 1988). The charges should be "legally separate, distinct crimes and no one of the offenses is a lesser included offense of the other." Smith, 429 So.2d at 255.
¶ 46. Although they arise from the same set of facts, the two offenses in the case sub judice are "legally separate, distinct crimes". The elements of aggravated assault, as delineated in Miss. Code Ann. § 97-3-7 (Supp. 1998), include:
 (a) attempting to cause serious bodily injury to another, or causing such injury
 (b) purposely, knowingly or recklessly
 (c) under circumstances manifesting extreme indifference to the value of human life; or
 (a) attempting to cause or purposely or knowingly causing bodily injury to another
 (b) with a deadly weapon or other means likely to produce death or serious bodily harm.
¶ 47. The elements of armed robbery, as set out in Miss. Code Ann. § 97-3-79 (Rev. 1994), include:
 (a) a felonious taking or attempt to take
 (b) from the person or from the presence
 (c) the personal property of another *Page 564 
 (d) against his will
 (e) by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon.
¶ 48. Aggravated assault requires no taking or attempt to take property, while armed robbery requires no actual attempt to cause bodily injury. Davis could have been found guilty of armed robbery without actually shooting Smith. Likewise, Davis could have been found guilty of aggravated assault without taking Smith's wallet.
¶ 49. Finding that armed robbery and aggravated assault are two legally separate, distinct crimes, we affirm the circuit court's denial of Davis's motion to merge.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY OFCONVICTION OF COUNT I ARMED ROBBERY AND SENTENCE OF TWENTY YEARSWITHOUT PAROLE AND COUNT III AGGRAVATED ASSAULT AND SENTENCE OFTWENTY YEARS TO RUN CONSECUTIVELY TO SENTENCE IN COUNT I AND TORUN CONSECUTIVELY TO ANY OTHER SENTENCE, ALL IN THE CUSTODY OF THEMISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OFTHIS APPEAL ARE ASSESSED TO JONES COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., BRIDGES, DIAZ, LEE,MOORE, AND PAYNE, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.
[1] Davis's attorney's calculations were incorrect. Following the sentencing recommendation resulted in only forty years' incarceration for this case, to be served consecutively to Davis's sentence of twenty years' incarceration for a previous case in another jurisdiction. Davis's sentences in Lauderdale County and Jones County totaled sixty years for manslaughter, armed robbery, and two aggravated assault charges. Sentences within the guidelines established by the legislature are not considered excessively cruel and unusual. Barnwell v. State, 567 So.2d 215
(Miss. 1990). Also, the sentencing court is not required to consider a sentence for a crime unrelated to the proceedings at hand. Harper v. State, 463 So.2d 1036, 1041 (Miss. 1985).